# In The Matter Of:

*Linda Smith, et al. vs.*
*NeXus RVs, LLC, et al.*

---

*Michael Potis*
*October 23, 2019*

---

*Midwest Reporting, Inc.*
*1448 Lincoln Way East*
*South Bend, Indiana 46613*
*reporters@midwestreporting.net*
*574-288-4242*

Original File Potis Michael.txt
**Min-U-Script® with Word Index**

PLAINTIFF'S
EXHIBIT
1
tabbies®

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

**Page 9**

1 Q. What engineering degree from any facility did you
2   receive?
3 A. Don't have one.
4 Q. Engineer is your job position or title; correct?
5   Actually, a job title. Is that right?
6 A. Job title.
7 Q. But you're not really an engineer registered or
8   licensed with any State; correct?
9 A. Correct.
10 Q. Who decided that you would be in the position of an
11   engineer?
12 A. The people that I work for.
13 Q. And when did you leave NeXus?
14 A. It would have been July of this year.
15 Q. Why?
16 A. Because they were constricting, saving money, and I
17   was one of several that was let go. We were laid
18   off.
19 Q. What department did you work in at NeXus?
20 A. Engineer.
21 Q. How many people worked in that department in an
22   engineering role?
23 A. Two besides me.
24 Q. Did the other person remain after you left?
25 A. Both of them remained after I left. After that, I

---

**Page 10**

1   don't know.
2 Q. Were you laid off because of seniority?
3 A. I think -- I don't know why I was laid off.
4 Q. Were you there with more seniority than the other
5   two who remained after you left?
6 A. Yes.
7 Q. So you had more seniority, but you were laid off
8   and the other two with less seniority were kept at
9   NeXus when you left; correct?
10 A. Correct.
11 Q. You wrote an expert report in this case, two pages
12   or one page, I believe; correct?
13 A. Two pages.
14 Q. Actually, I received one that was one-page long
15   that was signed by you and then I received one that
16   was two pages long. Which one's your real report?
17 A. Two-page.
18 Q. The two-page version?
19 A. Yes.
20 Q. It's not signed, though, is it?
21 A. I don't know.
22 Q. You have a file there that you brought with you
23   today. Is that everything that you have that has
24   anything to do with your work inspecting this RV --
25 A. Uh-huh.

---

**Page 11**

1 Q. -- for NeXus?
2 A. It has everything -- it has my -- it has everything
3   that I have available to me at this time.
4 Q. Okay. Anything else that you had or created or
5   whatever else was left behind at NeXus?
6 A. It was.
7 Q. And what would that be?
8 A. You'd have to get that information, sir.
9 Q. You don't know what it was that you left behind?
10 A. Just rough drafts of everything that I have here
11   completely.
12 Q. Anything else?
13 A. No.
14 Q. What about photographs or videos?
15 A. That was part of the deal that you already have.
16 Q. Do you still have those or were those left behind?
17 A. No, everything was left behind. This is all I have.
18 Q. All right. What's in the file folder that you're
19   pointing to is all you have; correct?
20 A. That is fact.
21 Q. Okay. My question is: What was left behind? Do
22   you know how many videos were left behind?
23 A. No.
24 Q. Do you know how many videos you even took at the
25   inspection that you did?

---

**Page 12**

1 A. Numbers now, no, I do not.
2 Q. Do you know how many photographs you took?
3 A. No.
4 Q. Did you take any photographs?
5 A. No. I took videos. That was what was requested.
6 Q. Are all of the expert opinions that you have in
7   this case in your two-page written report?
8 A. Yes.
9 Q. Did you do everything that you wanted to do during
10   your inspection of the RV?
11 A. I did.
12 Q. Is there anything that you did not do that you wish
13   you had done?
14 A. No.
15 Q. Did anyone rush you through your inspection in any
16   way?
17 A. Not at all.
18 Q. Do you know who built the chassis that was used on
19   the RV involved in this case?
20 A. International, I believe.
21 Q. Do you think that chassis manufacturer in this case
22   is responsible for any of the problems or
23   complaints that were ever raised by Mr. or
24   Mrs. Smith about this RV?
25 A. Not that I can think of.

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 13

1  Q.  Do you think NeXus RV is responsible for any of the
2       complaints that were ever raised about this RV by
3       Mr. and Mrs. Smith?
4  A.  Yes.
5  Q.  What?
6  A.  Just the fit and finish parts on the inside, which
7       was repaired.
8  Q.  And who repaired those?  Do you know?
9  A.  I have no idea.
10 Q.  There's some standard questions just like there are
11      standard instructions.  One of the standard
12      questions that has to be asked is whether or not
13      you're on any kind of medication today that would
14      interfere with your memory?
15 A.  Not at all.
16 Q.  Also whether or not you've ever been convicted
17      of any --
18 A.  Never.
19 Q.  No conviction of anything?
20 A.  No, sir.
21 Q.  No kind?
22 A.  No.
23 Q.  No level?  No degree?
24 A.  None ever.
25 Q.  Okay.  Be sure to let me finish my question before

Page 14

1       you answer; okay?
2  A.  All right.  Fair enough.
3  Q.  That's one of those rules that will make her mad.
4  A.  Okay.
5  Q.  And out of everybody in the room, the only one that
6       really counts is her; okay?
7  A.  Understood.
8  Q.  Thank you.
9       Tell me everything that you did to prepare for
10      your deposition today.
11 A.  Honestly, just went through, made sure I had copies
12      of -- of the things that I had in my possession,
13      which was my resumé and my two-page report, and
14      printed it out and here I am.
15      I've never been to a deposition before, so I
16      didn't know what to expect.
17 Q.  Did you talk with anybody?
18 A.  No.  Other than my wife, no.  My only confidant.
19 Q.  Did you review the videos at home?
20 A.  No.  I don't have them in my possession.
21 Q.  You no longer have any relationship at all with
22      NeXus; correct?
23 A.  Other than friendship, no, sir.
24 Q.  And when you say "friendship," you mean with the
25      corporation or with people --

Page 15

1  A.  People.
2  Q.  -- there?
3  A.  People.
4  Q.  That's what I thought you meant.
5       What people?
6  A.  Well, there's one right there.  Claude Donati.  I've
7       known him for many years.  Some of the other folks
8       that work there, just casual relationships.
9  Q.  A few casual co-workers and Mr. Donati, that you've
10      known for many years?
11 A.  And -- well, and Dave Middleton as well, one of the
12      other owners.
13 Q.  Do you own any stock or interest at all in NeXus
14      RVs?
15 A.  No.
16 Q.  Or in any motor vehicle or vehicle manufacturer?
17 A.  No.
18 Q.  How are you being paid for your time here today?
19 A.  You gave me a check.
20 Q.  That was an appearance fee and mileage, I think.
21      But other than that, you're not being compensated
22      by NeXus or anybody else; right?
23 A.  No.
24 Q.  Were you ever licensed by any State or agency at
25      all in relation to any of the work that you did for

Page 16

1       NeXus while you were working for them other than a
2       driver's license?
3  A.  No.
4  Q.  Who do you work for now?
5  A.  I don't.
6  Q.  Collecting unemployment?
7  A.  I am.
8  Q.  How long did you work for NeXus?
9  A.  2 years.
10 Q.  And was all that time in the role of an engineer --
11 A.  No.
12 Q.  -- job position?
13 A.  No.  Almost evenly broken between plant manager of
14      the main plant and then engineer.
15 Q.  Did you start as plant manager?
16 A.  I did.
17 Q.  Do you have any formal classroom education with
18      regard to your field of employment and job
19      responsibilities at NeXus?
20 A.  No.
21 Q.  Or with regard to your work in the RV industry?
22 A.  No.
23 Q.  So would it be correct that you have experience in
24      the industry as a worker within the industry, but
25      that's really it when it comes to your knowledge of

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 17

1    RVs?  Correct?
2  A.  Knowledge of RVs specifically, yes.
3  Q.  How would you describe what you did for NeXus
4      during the last year in the role of an engineer job
5      position?
6  A.  I -- my team and I put together everything necessary
7      for CSA and Transport Canada, which is the bulk of
8      what we did.  We designed several new floor plans and
9      standard everyday engineering work, which -- never
10     mind.
11 Q.  I'm not an engineer, so I don't know what standard
12     everyday engineering work is.
13 A.  I knew you were going to say that.
14 Q.  And I don't know what Transport Canada is and I
15     don't know what CSA is.  So, can you tell us?
16 A.  Yes.  CSA and Transport Canada are both Government
17     entities within Canada that make sure that they meet
18     Canadian guidelines and specifications so they can be
19     sold in Canada from the United States.
20 Q.  What guidelines and specifications were you
21     referring to?
22 A.  They have everything that's sold -- or built within
23     the unit has to have a CSA or a particular type of
24     stamp on it that says it was made and approved by
25     Transport Canada or by CSA.  So what I had to do is

---

Page 18

1      build a catalog of all the stuff that we used within
2      that so that we could make sure that it was covered.
3  Q.  So you could show, in fact, that it was something
4      that Transport Canada or CSA, which is in Canada,
5      had approved; correct?
6  A.  Uh-huh.  Yes.
7  Q.  And you also worked on floor plans, you say?
8  A.  Yes.
9  Q.  Anything else in your role or your job position of
10     engineer with NeXus?
11 A.  Yes.
12 Q.  What else?
13 A.  Taking care of day-to-day issues on the line.
14 Q.  Such as what?
15 A.  Such as something that doesn't fit, issues with how
16     things go together, whichever.  We go out and we
17     would investigate and solve issues.
18 Q.  When you say "we go out," you mean you?
19 A.  Physically walk out on the line, check out what the
20     problems are, and then make our best judgments as to
21     what the issue is and take care of that issue.
22 Q.  On how to fix it?
23 A.  Yes, sir.
24 Q.  Is that for a general manufacturing process or just
25     that particular unit and that particular issue?

---

Page 19

1  A.  That's general process.
2  Q.  I apologize.  Maybe I wasn't clear.  And if any
3      time you think I'm not clear, just let me know, and
4      I'll be glad to rephrase it.
5          What I meant was when you're called out for a
6      specific issue and a problem of some sort to look
7      at on the line --
8  A.  Uh-huh.
9  Q.  -- in order to help the line figure out what to do
10     about that, is that analysis that you do for that
11     particular problem on that particular coach?
12 A.  Yes.
13 Q.  Okay.  Do you also have any role in changing what
14     the line does with regard to the manufacturing
15     process?
16 A.  Yes.
17 Q.  Okay.  And tell me about that.
18 A.  It's done through a process called engineering change
19     request, which if something needs to be changed, that
20     way everybody's on the same page and understands the
21     need and the change that's requested.
22 Q.  Did you ever make an engineering request on the
23     make, model, year involved in this case?
24 A.  No, sir.  That was before my time.
25 Q.  So none on this unit and none on the model line?

---

Page 20

1  A.  I'm sorry?
2  Q.  You didn't -- you were not involved in any
3      engineering requests on this particular unit or in
4      the model line for this unit; correct?
5  A.  Correct.
6  Q.  Did you get any specific job training from NeXus
7      RVs when you were hired in?
8  A.  No.
9  Q.  Did you get any specific job training from NeXus
10     RVs when they put you in the job position of
11     engineer?
12 A.  No.
13 Q.  So you never received any specific training of any
14     kind from NeXus RVs; right?
15 A.  That's correct.
16 Q.  In your job position at NeXus RVs did you have
17     access to the records on this particular RV?
18 A.  Yes.
19 Q.  Did you actually look at any of the records on this
20     particular RV at any time?
21 A.  When I was asked to do an inspection, yes, sir, I
22     did.
23 Q.  What did you look at?
24 A.  Just the order, the order for the unit, the paperwork
25     from the traveler that goes down with the unit as it

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 25

1  were referring to having reviewed that was
2  something that you normally would not expect to
3  see?
4  A. Not to my recollection, no.
5  Q. Now, you brought a file with some documents with
6  you today. Can you tell us the name of the
7  documents that are in the file?
8  A. Yes. First of all, is the two-page inspection
9  report, which I can provide you, if you wish. And
10  the other one is my resumé.
11  Q. When did you create this resumé?
12  A. Oh, it's been updated recently, but I created this --
13  it's been ongoing for many years.
14  Q. Was your job position at NeXus an engineer or
15  director of engineering and product development?
16  A. Director of engineering and product development.
17  Q. The new Class As that you worked on, what models
18  were those?
19  A. To be honest, I don't recall the names.
20  Q. The new Class Cs that you worked on, super Cs, what
21  ones were those?
22  A. Don't recall the names of them either.
23  Q. As your job of director of that department went,
24  you had two employees you oversaw; would that be
25  correct?

---

Page 26

1  A. Yes, sir.
2  Q. And were they both engineers? Or -- let me strike
3  that. Let me strike that.
4  Did both of those people have the job position
5  of an engineer?
6  A. Yes.
7  Q. Do you know whether or not they also possessed
8  engineering degrees from any college or university?
9  A. That I do not know.
10  Q. You don't know one way or the other; right?
11  A. No.
12  Q. They just have the job position, as far as you
13  know?
14  A. Uh-huh.
15  Q. What did Turtle Top manufacture?
16  A. Buses, transit buses.
17  Q. What did MPV manufacture?
18  A. Anything you can dream of.
19  Q. I'm sorry?
20  A. Anything you can dream of. It's custom built.
21  Somebody would need something specific and special,
22  we would design it and build it.
23  Q. When you worked at Gulf Stream, you -- did you have
24  an engineering experience or degree there?
25  A. I don't have any degree, sir.

---

Page 27

1  Q. Was your job position with them, however, just
2  simply that of an engineer?
3  A. I was there as director of engineering.
4  MR. BURGE: Off the record.
5  (Off the record.)
6  MR. BURGE: Let's go back on.
7  BY MR. BURGE:
8  Q. Have you ever testified in court before?
9  A. No, sir.
10  Q. And you've never given a deposition neither;
11  correct?
12  A. No, sir.
13  Q. Until today?
14  A. That's correct.
15  Q. Have you ever been involved in a lawsuit as either
16  a plaintiff or a defendant, somebody being sued or
17  somebody suing?
18  A. No, sir.
19  Q. During your time at NeXus RV, did they have a
20  quality control department?
21  A. Yes, sir.
22  Q. Did you work with that department?
23  A. Worked with them, yes.
24  Q. Who was in charge of quality control there when you
25  left?

---

Page 28

1  A. I believe that ultimate responsibility fell to the
2  owners so it could stay separate from the day-to-day
3  operations.
4  Q. Do you know how many people worked in quality
5  control at NeXus while you were there?
6  A. Three.
7  Q. But they were actually supervised by the owners?
8  A. They reported ultimately to the owners, yes.
9  Q. Who supervised them?
10  A. I don't know.
11  Q. And who did you understand the owners to be?
12  A. Claude Donati, Dave Middleton.
13  Q. Anyone else?
14  A. No, sir.
15  Q. Do you know who the owners are now?
16  A. There's some other investors besides them, but I do
17  not know who they are, no.
18  Q. Prior to starting your work with NeXus RV, where
19  did you work and what did you do or is it all in
20  your resumé?
21  A. It's all in my resumé.
22  Q. Okay. Were you ever laid off from any other place
23  you ever worked before NeXus?
24  A. Yes.
25  Q. Were you ever fired or terminated from any

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 29

1  position?
2  A. No.
3  Q. Were you laid off during the '07/'08 time frame?
4  A. Oh, yeah.
5  Q. Is that the only layoffs you're talking about other
6      than recently with NeXus?
7  A. NeXus -- well, actually, as far as specific layoffs
8      go, when Turtle Top was sold out to Forest River, I
9      was laid off. And when NeXus, you know, did their
10     constricting, then I was laid off there as well.
11 Q. You're not an expert in the NeXus RV warranty, are
12     you?
13 A. No, sir, I'm not.
14 Q. When did you first become aware of the RV involved
15     in this case, that particular unit? So far as you
16     know, when did you first become aware of it?
17 A. When Dave Middleton asked me if I would do -- go and
18     inspect the unit.
19 Q. Do you remember when that was?
20 A. No, I don't remember the exact date.
21 Q. Roughly how much time passed between when you were
22     asked and when you actually did the inspection?
23 A. I think it was only like 2 or 3 weeks.
24 Q. And what did he tell you when he asked you to go
25     inspect it?

Page 30

1  A. That there was --
2  Q. What did he say?
3  A. -- potential litigation with this particular unit and
4      that they need somebody to go over and check it out,
5      take it and weigh it, and make sure everything
6      functioned. So I said, yes, I would do that.
7  Q. So the only instructions he gave you were weigh it,
8      check it out, make sure everything functioned?
9  A. Uh-huh.
10 Q. Any other instructions at all from him?
11 A. No.
12 Q. And why did you video?
13 A. Because I was told to.
14 Q. By who?
15 A. By the lawyers here.
16 Q. They told you to videotape your inspection?
17 A. Yes, sir.
18 Q. I want to be sure I have it right. Am I correct
19     that you have no professional education or training
20     in the recreational vehicle industry; it's all been
21     on-the-job experience?
22 A. That's correct.
23 Q. Product development group, was that's inside the RV
24     industry or outside of the RV industry?
25 A. Inside.

Page 31

1  Q. Let me finish, please.
2      And your resumé job description of what you
3      did for them, does that include everything you did
4      for them?
5  A. Yes.
6  Q. Was that your first involvement in the RV industry?
7  A. Yes, sir.
8  Q. And you went from that to being plant manager for
9      the Conquest; correct?
10 A. Yes.
11 Q. You have a two-line entry here that says, "Gulf
12     Stream Coach, July 1997 to October 2009. Reported
13     to Ron Lemert, vice president."
14 A. Correct.
15 Q. There's no explanation for what you did there that
16     I see on this resumé.
17     What did you do for them?
18 A. For Ron Lemert?
19 Q. Yes.
20 A. Everything you see written there is what I did for
21     Ron Lemert.
22 Q. Engineering and product development?
23 A. Yes.
24 Q. So this paragraph that's set off separately below
25     is part of the Gulf Stream work? On the second

Page 32

1  page. Bottom of the second page.
2  A. Everything below it.
3      Ron Lemert was my immediate supervisor, just like
4      it is the rest of the resumé.
5  Q. So the product development group, the Conquest
6      division work, and the engineering and product
7      development, all three of those were part of your
8      work with Gulf Stream; correct?
9  A. Yes.
10 Q. Did you ever actually work on the product assembly
11     line at any RV manufacturer as your regular job
12     position?
13 A. At Gulf Stream, yeah, I did.
14 Q. I'm sorry?
15 A. At Gulf Stream I did in the cabinet shop.
16 Q. And which one of these three positions did you work
17     on the line?
18 A. It would be right during the time that I did product
19     development. That's how I was able to understand
20     what was necessary out on the line and it gave me a
21     better opportunity to do a better job in a design
22     factor.
23 Q. But working on the line was not your full-time
24     assigned position?
25 A. It was at that time because we constricted at the

USDC IN/ND case 3:17-cv-00815-DRL   document 46-1   filed 02/17/20   page 7 of 25

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 33

1    time.  We went from 178 people or something down to
2    35.  I became one of those that had to work.
3  Q.  So did you leave the director of engineering and
4    product development position, go to the line?
5  A.  No.  It was during product development early on, the
6    product development group.  After that I stayed.
7  Q.  I apologize, but I simply didn't understand the
8    paragraph here because the paragraph doesn't say
9    anything at all about working on the line.
10    Of what -- for what period of time did you
11    actually do the production line work as a
12    production line worker?
13  A.  Within those -- the time parameters given for product
14    development --
15  Q.  For how long?
16  A.  -- when necessary.
17    I couldn't tell you that.  I don't know.
18  Q.  Did you just go out periodically and do that?
19  A.  No.  I was assigned.
20  Q.  Okay.  You were assigned and you worked on the
21    production line --
22  A.  In the cabinet shop.
23  Q.  Let me finish.
24    -- for some period of time, but you don't
25    recall how long it was?

Page 34

1  A.  That's correct.
2  Q.  Other than that period of time, you never actually
3    were a production line worker within the RV
4    manufacturer; right?
5  A.  Correct.
6  Q.  And in that period of time was it a matter of a
7    couple of weeks or a couple of months or a couple
8    of years, or what?
9  A.  Answer -- I don't understand your question.
10  Q.  That you worked on the line as a production line
11    worker?
12  A.  I only worked on the production line worker at the
13    beginning of my career, as a state stop.  You know,
14    that part of the product development.
15  Q.  For about how long?
16  A.  Well, since I was in there for several years, I would
17    say it would probably be a good year at least.
18  Q.  I apologize, we didn't mention at the beginning
19    that any time you want to take a break, just let me
20    know.  We will; okay?
21  A.  No, let's go.
22  Q.  Are you associated or affiliated in any way at all
23    with any recreational vehicle industry organization
24    or trade group or professional association?
25  A.  Nope.

Page 35

1  Q.  Have you ever published any kind of professional
2    articles or writings relating to motor vehicles or
3    the recreational vehicle industry?
4  A.  Official article, no.  I was interviewed through Auto
5    Desk.  We were the one-millionth customer of their
6    products and I was in the Internet through an article
7    that was written about us, but that's it.
8  Q.  So you were interviewed as part of an article --
9  A.  But I was not --
10  Q.  -- that somebody else wrote?
11  A.  That's correct.
12  Q.  But you've never written any yourself; right?
13  A.  No.
14  Q.  And have you worked for any kind of consultant
15    relating to recreational motor vehicles or any kind
16    of motor vehicle outside of your regular employment
17    position work?
18  A.  No.
19  Q.  Did you receive an actual college degree from
20    Vincennes University?
21  A.  Certificates.
22  Q.  Certificate of Achievement?
23  A.  Yes.  I guess.
24  Q.  Not a college degree, though; correct?
25  A.  That's correct.

Page 36

1  Q.  You were there one year; right?
2  A.  What?
3  Q.  You were there for one year?
4  A.  Where?
5  Q.  Vincennes University.
6  A.  That was done through Vincennes University and Gulf
7    Stream University.  It was done at Gulf Stream.
8  Q.  You didn't actually go to the separate university.
9    It was at Gulf Stream itself; correct?
10  A.  That's correct.
11  Q.  Cleveland Institute of Electronics in 1979 and '80.
12    Was that also part of the Gulf Stream
13    University work?
14  A.  No.  That was way before I went to work for them.
15  Q.  Did you actually go to Cleveland or was that a --
16  A.  No, it was a mail-order --
17  Q.  Mail-order electronics course?
18  A.  -- class -- yes.
19  Q.  Was that electronics coursework there -- have
20    anything to do with your inspection in this case?
21  A.  No.
22  Q.  That was for less than one year; right?
23  A.  Yes.
24  Q.  Have you ever inspected any other recreational
25    vehicles for defects other than this one?

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

**Page 37**

1  A.  Outside the buildings or -- you know, I --
2  Q.  Outside the building.
3  A.  No, sir.
4  Q.  Post sale, post retail sale?
5  A.  No.
6  Q.  Did NeXus ever ask you to inspect any RV that was
7      finished being built but still on the property
8      before being sold wholesale to anybody or retail to
9      anybody?
10 A.  Many times.
11 Q.  Why?
12 A.  "What about this?"  "What about that?"  Just
13     looking -- asking questions about specifics.
14     Whatever may, you know, be important to them on that
15     particular day.
16 Q.  You don't recall how many, how many times?
17 A.  Of course not.
18 Q.  How would you characterize the issue with this RV
19     as you see it?
20 A.  What do you mean by "characterize"?
21 Q.  Well, what would you call it?
22 A.  I don't know what I would call it, to be honest.
23 Q.  Have you seen this problem in any other NeXus RVs,
24     the problem that was raised by Mr. and Mrs. Smith?
25 A.  No.

---

**Page 38**

1  Q.  Did you ever have any personal involvement with
2      Mr. and Mrs. Smith directly at any time for any
3      reason?
4  A.  No, other than handing me the keys.  That's the only
5      time we -- we didn't even speak then.  Mr. Smith was
6      not home at the time.
7  Q.  So you just got the keys from Mrs. Smith at the
8      time of the inspection and that was the extent of
9      it?
10 A.  That's correct.
11 Q.  And at the end of your inspection did you give the
12     keys back to her?
13 A.  I did.
14 Q.  Did you ever review any photographs of this RV that
15     were taken by anybody at all?
16 A.  No.
17 Q.  Other than the video you did?
18 A.  I'm sorry.  No, sir, I did not.
19 Q.  Where did you get Mr. Grismer's report that you
20     said you read?
21 A.  From here.
22 Q.  From the law office?
23 A.  Yes.
24 Q.  Did you get a copy of it or did you just come in,
25     sit down and read it, and then leave it here?

---

**Page 39**

1  A.  No.  I received a copy of it.
2  Q.  Did you make any notes on it?
3  A.  No.
4  Q.  Or did you just read it and that was it?
5  A.  I read it.  That was it.
6  Q.  Do you think there's any problem with the RV
7      involved in this case?
8  A.  Personally, no.
9  Q.  As far as you're concerned, it's good enough for
10     you; right?
11 A.  It would have been, yes.
12 Q.  You understand the complaint that Mr. and
13     Mrs. Smith have about it?
14 A.  As far as -- the only thing that I understand that
15     was -- or at least the majority of it, the issue was
16     the weight.
17 Q.  The weight?
18 A.  Yes.
19 Q.  And what do you understand the problem to be that
20     they raised about the weight of the RV?
21     W-e-i-g-h-t.
22 A.  There wasn't a lot of weight left on the front axle
23     when they loaded it.
24 Q.  Where did you get that understanding that that was
25     the complaint they were making?

---

**Page 40**

1  A.  From Mr. Grismer's report.
2  Q.  Anywhere else?
3  A.  No.  Not to my recollection.
4  Q.  At the time that you inspected the RV, did you see
5      any problem at all with the RV?  And if so, what?
6  A.  I saw one issue, and that was the step was not
7      functioning.
8  Q.  What step?
9  A.  The entry step.
10     When you open the door, the step opens.  The
11     entry step.  When you open up the entry door, the
12     step would come out.
13 Q.  It would or would not?
14 A.  It would not.  It was -- did not function.  It had
15     residue of -- looked like duct tape on it.  Maybe to
16     hold it in place or something at one time.  But it
17     did not function at all.
18     I checked it for wiring.  The wiring was correct.
19     Past that, I have no clue what the scoop was.
20 Q.  Did you inspect that part as well, then, during the
21     time you inspected the RV?
22 A.  Yes.
23 Q.  Did you open the hood?
24 A.  Absolutely.
25 Q.  What did you do when you opened the hood?

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 41

1 A. Checked all the fluid levels. It's stated there in
2    the report.
3        It was a quart low on the oil when I took it for
4    a drive.
5 Q. One quart low doesn't bother you; right?
6 A. I'm just merely stating what it was.
7 Q. If it had been of concern to you, you would not
8    have taken it for a drive without putting another
9    quart of oil in; correct?
10 A. That is correct. Correct.
11 Q. During your inspection of the RV, did you see any
12    indication of any abuse of the RV by the owners?
13 A. No.
14 Q. Did you see any indication of negligent use of the
15    RV by the owners?
16 A. No.
17 Q. You've never given any prior testimony in any kind
18    of dispute where you made a statement under oath
19    relating to an RV in any way at all; right?
20 A. That's correct.
21 Q. In your review of the build records, did you rely
22    on the accuracy of those as you reviewed them?
23 A. I wanted an overview of what I was going to look at.
24 Q. Did you assume them to be accurate?
25 A. Oh, absolutely.

Page 42

1 Q. That's what I'm getting at.
2 A. I'm sorry, yes.
3 Q. You didn't see anything any place that indicated to
4    you that there was something in the records that
5    was not accurate; right?
6 A. No.
7 Q. The outside repair order, the repair order relating
8    to the RV done by an outside company, not by NeXus
9    itself, did you look at what was listed on that?
10 A. I did at the time, yes.
11 Q. Did any of that strike you as unusual for the age
12    and mileage of the RV at the time it was occurring?
13 A. No.
14 Q. Did you see anything in the RV at the time that you
15    looked at it or in any of the records that appeared
16    to you to be a lack of maintenance on the RV that
17    was the fault of the owners that contributed to any
18    issue whatsoever?
19 A. Not that I could see, no, sir.
20 Q. In looking at all of the build records and all of
21    the other NeXus documents and their business
22    records relating to this RV, did you see anything
23    that indicated to you that NeXus RV had
24    accidentally done anything in the construction of
25    this RV?

Page 43

1 A. Certainly not.
2 Q. Or in the handling of any complaints?
3 A. No.
4 Q. You are aware that Mr. and Mrs. Smith did complain
5    about the RV, right, to NeXus?
6 A. It was in the paperwork, yes.
7 Q. Did you read any of the emails?
8 A. No.
9 Q. Are you aware that emails existed?
10 A. I was, but I was -- what I wanted to do was have an
11    honest appraisal of the vehicle without any outside
12    intervention and outside considerations.
13 Q. And it was Mr. Middleton who asked you to do the
14    inspection; right?
15 A. Yes.
16 Q. Did you understand that you would end up testifying
17    in this case if you did that?
18 A. I got the impression. This wasn't something we
19    actually discussed.
20 Q. It was a potential lawsuit situation, he said?
21 A. Yes. Yes. Yes, sir.
22 Q. And you understood that you might have to testify
23    at some point?
24 A. Yes, sir.
25 Q. And you understood at the time he asked you to look

Page 44

1    at it; right?
2 A. Yeah. Yes, sir.
3 Q. Have you ever looked at the owner's manual for this
4    RV?
5 A. The specific RV? No, sir.
6 Q. You've seen other NeXus RV manuals -- owner
7    manuals; right?
8 A. Just on the USBs. I've never fully looked at them,
9    no.
10 Q. Have you looked at them on a USB?
11 A. No.
12 Q. So you've never really looked at the owner's
13    manuals for the NeXus RVs; right?
14 A. No, I have not.
15 Q. Before you inspected this RV, had you ever done an
16    inspection on the make, model, year of this RV on
17    any other RV?
18 A. No, sir.
19 Q. Have you done any since?
20 A. (No audible response.)
21 Q. Done any inspections since?
22 A. No, sir, I have not.
23 Q. Did you test-drive the RV?
24 A. Yes, sir.
25 Q. How many miles do you think you test-drove it?

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 49

1    everything to make sure there was nothing loose for
2    your test-drive?
3 A. Right.
4 Q. At least that; right?
5 A. Yes.
6 Q. And would it be correct that you drove around
7    before driving to the weigh station?
8 A. In the vehicle?
9 Q. Yes.
10 A. Yes.
11 Q. And --
12 A. Through town -- through town, around, so I could get
13    both highway and city reactions to the vehicle.
14 Q. Then after that driving, you then drove to the
15    weigh station?
16 A. During -- that's how I got to the weigh station, by
17    doing all the driving. So technically, yes.
18 Q. Yeah. So you drove around town and highway and
19    whatever, and then you went to the weigh station?
20 A. To the Pine Cone --
21 Q. How much was test-driving the RV before deciding to
22    head to the weigh station?
23 A. Maybe 25 minutes or so.
24 Q. You drove to the weigh station. What happened at
25    the weigh station?

Page 50

1 A. I contacted the lady inside, a Michelle Rosa, who
2    assisted me in getting the weights and got the
3    printout and then took it around to the -- there's a
4    big parking lot behind there. And then that's where
5    I did the inspection.
6 Q. Oh, okay. So after doing the weighing, you then
7    pulled on to an adjacent empty parking area?
8 A. Uh-huh.
9 Q. Then you inspected the outside of the RV and took
10    your videos?
11 A. Yes.
12 Q. And the inside of the RV and took your videos?
13 A. Yes.
14 Q. Why would you take the videos inside and outside in
15    general of the RV? Was there something in
16    particular you were looking at or trying to show?
17 A. I was told as I inspected it to take videos.
18 Q. Okay. Your inspection also included, then, the
19    drive back to the Smiths' where you then handed
20    over the keys; correct?
21 A. Just --
22 Q. The inspection process.
23 A. Well, just make sure nothing else showed up during
24    the drive, but --
25 Q. Okay.

Page 51

1 A. -- essentially, yes.
2 Q. Your inspection that you did of this RV then
3    started when you got out of your vehicle to go
4    inspect it at about 12:48 p.m., everything that you
5    just described, and then it ended when you parked
6    it back where you had picked it up, and then turned
7    the keys over to Mrs. Smith; right?
8 A. Uh-huh.
9 Q. So everything in between there was your inspection
10    process in one way or another; right?
11 A. That's correct.
12 Q. The weigh station that you went to, was this one
13    that you pull up on the weigh scale?
14 A. It's CAT scales.
15 Q. Does that mean yes or no?
16 A. Yes. You pull up and you drive onto it.
17 Q. All right. And was the entire RV on it?
18 A. Yes, sir, it was.
19 Q. Did you pull up onto the scale in a manner where
20    only part of the RV was ever on it?
21 A. Yes, I did.
22 Q. You didn't tell me about that before.
23 A. You didn't ask.
24 Q. Explain, if you would --
25    Well, I'm asking now.

Page 52

1 A. Okay. There you go.
2 Q. Explain that.
3 A. We did a front axle, rear axle, the total, which was
4    separated and shown on the weigh ticket.
5 Q. Wonderful. Now I know what you did. Now, tell me
6    how you did that. Describe that for me. That's
7    what I asked.
8 A. Pulled it up -- sorry. Pulled it up. The lady told
9    me that she's got an overall -- there's an intercom
10    there. She said, "Okay. I got the full weight. Got
11    the rear axle. Got the front axle." And then it
12    was -- then I just listened to her tell me when I was
13    done and moved off. Then I went inside and I got --
14 Q. Did you pull --
15    Let me finish, please.
16    Did you pull onto the scale or did you move
17    around on the scale?
18 A. I pulled on the scale.
19 Q. And then let it sit?
20 A. Yes, sir.
21 Q. And then she did her weights --
22 A. Yes.
23 Q. -- measuring?
24 A. Yes, with me out of it.
25 Q. Without you having to move around at all? Just

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 53

1   leaving it sit?
2 A. That is correct.
3 Q. You got out of it before she did her --
4 A. I did.
5 Q. Let me finish.
6       You got out of it before she did her scale
7   weightings?
8 A. Yes.
9 Q. How do you know it was before?
10 A. Because she told me on the intercom.  I said, "Yes,
11   ready to go," hit the button, and she goes.
12 Q. All right.  Was there any point in time at where
13   only one axle was on the scale that you had pulled
14   the RV up onto?
15 A. Yes.  When they were doing the axle weights, which
16   like I stated, is on the -- wherever the paperwork
17   may be.  It's listed on there as a breakdown.  But
18   it's also on your piece of paper right there.
19 Q. Have you seen other kinds of weight scales for RVs
20   and trucks?
21 A. Other than a CAT scale, I never had a need to go
22   check.
23 Q. Have you ever done this kind of weighing process
24   before?
25 A. In R&D situations with 4-corner scales, yes.

Page 54

1 Q. Okay.
2 A. But nothing like what I did there.
3 Q. Nothing like what you did with this one; right?
4 A. That's correct.
5 Q. Okay.  What is a 4-corner scale?
6 A. Four separate scales that show each corner weight.
7 Q. And that is not what you did on this RV; right?
8 A. That is correct.
9 Q. Did you have any other conversation at all with the
10   people there employed by the scale company --
11 A. No.
12 Q. -- who owned it?
13 A. No.
14 Q. Did you receive a slip from them indicating what
15   they concluded?
16 A. Yes.
17 Q. Or what their machinery concluded?
18 A. Yes.
19 Q. Did you get any other document of any kind from
20   them?
21 A. No.
22 Q. Did you ask for any other kind of document?
23 A. All I wanted was the actual weight scale slip.
24 Q. Did you ask for any other document?
25 A. No, sir.

Page 55

1 Q. Did you ask any questions of them or have any kind
2   of conversation with them that you have not told me
3   about?
4 A. No, sir.
5 Q. So you just said what you were there for, pulled
6   up, got out --
7 A. As I stated -- let me finish.
8 Q. Let me finish, please.
9       You just -- you stated what you were there
10   for.  The RV was sitting on the scale.  You got out
11   of it.  She did what she did, handed you the slip.
12   You got back in it, and then pulled around, and
13   then took your video of the outside and inside.
14       Is that a correct summary of it?
15 A. No, it's not.
16 Q. Fill me in on what I missed, then.
17 A. Like I said before, I pulled up to get directions on
18   how to do it because I had never done it before.
19   Then she walked me through everything.
20 Q. Oh.
21 A. So that's what happened.  Then we went through pretty
22   much everything you stated.
23 Q. When you say she walked you through it --
24 A. She told me --
25 Q. -- explain that for me.

Page 56

1 A. Pull up.  Going to let her know that it's up at a
2   certain spot.  She would take the weight, pull up,
3   you know, and have the -- the single axle, she would
4   take the weight, and go from that point in time.
5 Q. So you moved the RV around?
6 A. Yeah, of course.  You have to in order to separate it
7   from -- separate from one axle to another.
8 Q. Well, I know that, but that wasn't what you
9   explained when you said -- I asked you if you
10   pulled up and let it sit.
11       You actually pulled forward and back; right?
12 A. I did state that we moved it, but that's okay.
13 Q. Okay.  You moved forward and you moved backward so
14   only part of it was on the scale --
15 A. Yes.
16 Q. -- at one time or another; right?
17 A. Correct.
18 Q. Let me -- please let me ask the whole question
19   before you give me an answer so we can be sure that
20   we're accurate in what we're saying here.
21       Did you ever have only the left side or only
22   the right side of the RV on the scale?
23 A. No.
24 Q. So everything that you've just described from the
25   time you arrived to the time you end and everything

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 57

1   done in between, the total time of your inspection
2   of this RV was roughly an hour and
3   three-quarters to 2 hours in length from beginning
4   to end; right?
5 A. Yes.
6 Q. Did you, yourself, perform any kind of tests in any
7   way at all about -- on any part of the RV other
8   than what she did? Because you didn't do that; she
9   did that. I'm only asking did you do anything?
10 A. Just on the weights?
11 Q. On anything.
12 A. Yes. When I took the -- did the inspections off to
13   the side, I opened -- well, what are you asking me?
14 Q. What testing of any kind did you do on the RV?
15 A. I did a function test on everything.
16 Q. What does that mean, "function test"?
17 A. "Function test" means I checked to make sure that all
18   the accessories worked, made sure the rooms worked.
19 Q. Slideouts?
20 A. Yes, sir. Made sure the slideouts functioned.
21   Looked for any issues, any anomalies that would be
22   when they functioned, and just did a -- you know, a
23   physical check of everything on the inside; doors,
24   you know, glass windows, bed underneath, that kind of
25   thing.

Page 58

1 Q. "Bed underneath," what does that mean?
2 A. Well, just lift it up, look underneath the bed to see
3   if there's anything going on there.
4 Q. The bed lift?
5 A. Yeah.
6 Q. Okay. Go ahead.
7 A. And on the outside making sure the jacks functioned,
8   which they did. Find out if -- that's where I
9   discovered that the step was, you know, most
10   definitely not functioning. And then looking for
11   inside all the baggage areas.
12 Q. What do you mean looking for the baggage areas?
13 A. Open up all the baggage doors.
14 Q. The basement compartment?
15 A. Basement storage to make sure -- just to check out
16   the state of those.
17 Q. Make sure all the doors were working right?
18 A. Make sure they were functioning, make sure everything
19   was dry on the inside. Learned about dryer sheets.
20   I didn't know they repelled rats and stuff like that.
21   I appreciate that information.
22 Q. What did you say?
23 A. Everywhere throughout the vehicle there were dryer
24   sheets. And I didn't realize -- I did some research
25   afterwards. Because I pointed it out in the videos

Page 59

1   and in writing that there was -- these were
2   everywhere.
3 Q. What research did you do about why there were dryer
4   sheets scattered around?
5 A. I just didn't know what the reasoning would be why
6   they were all over the place other than to make it
7   smell better, only to discover that --
8 Q. What research did you do?
9 A. I got on the Internet and I checked to see -- I'm
10   sorry. I got to be specific here -- to see why would
11   you do that. This was after the fact.
12     It repels rats, mice, that sort of thing.
13 Q. Rodents?
14 A. Yeah. There you go. Thank you.
15     So that was -- I was impressed with that because
16   I've done it since, so I thank you for that
17   information.
18     Other than that --
19 Q. She didn't give you that information. You got on
20   the Internet and found that information?
21 A. She provided me with the impetus to do so, sir.
22 Q. What do you mean she provided you with the impetus?
23   I thought you didn't have any conversation with her
24   other than just getting the keys.
25 A. Her -- by doing that, she caused me to look and see

Page 60

1   why she did it.
2 Q. Okay. Have we now talked about all of the
3   conditions of the vehicle that you observed?
4 A. I think so.
5 Q. Only thing that you thought odd about the
6   vehicle -- that's the wrong word. I apologize.
7     The thing that did not function that stands
8   out in your mind at this point is the entry step?
9 A. Yes, sir.
10     MR. BURGE: It's been an hour and
11   20 minutes. And my rule is to try to
12   give the person a break every hour and a
13   half, give or take a little bit.
14     Why don't we take a break for a few
15   minutes so you can stretch your legs.
16     THE WITNESS: Your call, sir.
17     MR. BURGE: We'll start back up in
18   just a few minutes.
19     THE WITNESS: Very well.
20     (Off the record.)
21     (Plaintiffs' Exhibit No. 4 marked.)
22 BY MR. BURGE:
23 Q. Is there anything else that was done or that you
24   did or checked or either in the inspection process
25   or in relation to the inspection process that we

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 61

1  haven't covered now?
2  A. I don't think so, sir.
3  Q. Anything that you did or research or inspected or
4     checked that day that we haven't covered?
5  A. I think we've covered it all.
6  Q. Anything that you noticed that day in relation to
7     any of your inspection work at all that we haven't
8     covered?
9  A. No.
10 Q. Anything that you did or researched or inspected or
11    noticed in relation to any of the opinions that you
12    have stated in your report or that you have in this
13    case that we haven't covered?
14 A. No.
15 Q. The resumé that you brought with you today I've
16    marked as Exhibit 4.
17 A. Okay.
18 Q. Have you ever given a copy of that to anybody
19    before you brought it with you here today in
20    relation to this case?
21 A. No.
22       (Plaintiffs' Exhibit No. 5 marked.)
23    BY MR. BURGE:
24 Q. The two-page report that you brought out of your
25    file here that you also brought with you today I've

---

Page 62

1     marked as Exhibit 5; okay?
2  A. Okay.
3  Q. You made some videos. You talked about those. And
4     I have them with me, if you want to look at any of
5     them.
6        Do you feel you need to look at any of them at
7     the moment?
8  A. Huh-uh.
9  Q. All right. Video ending with No. 1944 appears to
10    be a walk-around video on the driver's side opening
11    the compartment doors.
12       Do you remember that?
13 A. Yes.
14 Q. Why did you take that video other than -- well, you
15    tell me why you took the video. Just to document
16    it?
17 A. I was instructed to take videos, you know.
18 Q. All right. 1945, that video number appears to be
19    basically just your rearview of the tail-end of --
20 A. Uh-huh.
21 Q. -- the RV; correct?
22 A. Yes.
23 Q. 1946 appears to be the driver's side and overall
24    view of the RV taken at a distance?
25 A. I don't recall, but it could be, yes.

---

Page 63

1  Q. All right. You took one of those like that?
2  A. I did, yes.
3  Q. Okay. There was nothing in particular about any of
4     these videos that you took that is related to any
5     opinion that you have in this case, is there?
6  A. No.
7  Q. They just show the overall condition of the RV in
8     general?
9  A. If I may, I wanted -- yes, I looked at it, you know,
10    inside and out, and I wanted to make sure -- because
11    I was directed to create visual evidence, I did so.
12 Q. We could go through them all. I have 16 from 1944
13    to No. 1959. And they all appear to be essentially
14    just showing what you were able to see?
15 A. Uh-huh.
16 Q. And none of it appears to be related to any issue
17    in this case; correct?
18 A. I --
19 Q. As far as you're concerned, is --
20 A. Yes.
21 Q. -- any of these videos --
22 A. It's --
23 Q. -- related to anything in dispute in this case,
24    that you're aware of?
25 A. I don't believe so.

---

Page 64

1  Q. Thank you.
2        These 16 different video clips that I have,
3     each one is a separate video clip; correct?
4  A. Yes.
5  Q. And you actually operated the video and took each
6     of these individually; right?
7  A. It was on my phone. On my phone, sir.
8  Q. You did that individually yourself; correct?
9  A. Yes.
10 Q. Did you take any other videos other than these 16 I
11    received?
12 A. No.
13 Q. And you have not edited down any of these 16 I
14    received; right?
15 A. I don't have the knowledge to do so, sir, no.
16 Q. Your inspection took nearly 2 hours, but there's
17    less than a total of 5 minutes of video here.
18       Why didn't you take any video of the rest of
19    what you were doing and what was happening?
20 A. Because my phone was maxed out.
21 Q. What do you mean, it "maxed out"?
22 A. I didn't have enough room for any further photo --
23    further videos.
24 Q. So you didn't bring any other equipment to video
25    with?

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 65

1 A. No, sir.
2 Q. You didn't bring a camera or a video separate from
3   your telephone?
4 A. I was told -- I'm sorry.  Go ahead.
5 Q. You didn't bring a camera or a video separate from
6   your telephone; correct?
7 A. No.
8 Q. You were told what?
9 A. I was told the day before I left by somebody here
10   that it needed to be videoed.  And up to that point I
11   had no clue that it needed to be done that way.
12 Q. So it was only the day before you learned that you
13   should be videoing while you were there?
14 A. Yes.
15 Q. And what did you understand needed to be videoed?
16 A. My inspection.
17 Q. All of it?
18 A. Yes.
19 Q. And why didn't you video all of it from the
20   beginning?
21 A. Kind of hard to drive and video at the same time,
22   sir.  I videoed.  I -- the dash and everything when
23   it was running in the vehicle on the inside before I
24   left and everything up to -- you know, until I
25   brought it back.  That's it.

---

Page 66

1 Q. You videoed the dash when it was running?
2 A. Yes.  I videoed the dash around about the front at --
3   you know, the cockpit area.
4 Q. There is a video of the cockpit area from a
5   distance, but not in terms of --
6 A. No, I just wanted --
7 Q. -- showing anything.
8 A. That's -- that's what I mean, sir.
9 Q. Okay.  But the first thing you did was check the
10   fluid levels before even starting the engine;
11   right?
12 A. Uh-huh.
13 Q. You didn't video that; right?
14 A. No, I didn't.
15 Q. And before you could get into the RV, you noticed
16   that the entry step wasn't working; right?
17 A. Uh-huh.
18 Q. But you didn't video that?
19 A. No.
20 Q. You said that you determined --
21 A. It's in the video later on, a different video.  The
22   step is pointed out as in-op.
23 Q. One of these 16?
24 A. Yes, sir.  When I opened up the door, I stated that
25   the step did not function.  Then I went inside.

---

Page 67

1 Q. There's a video that you took --
2 A. In one of those videos.
3 Q. Let me ask the question.
4     There's a video that you took showing you
5   opening the door?
6 A. Yes.
7 Q. Do you know how many video clips you took?
8 A. No.
9 Q. You don't know if you took 16 or 17 or 18 or a
10   dozen?
11 A. No.
12 Q. Did you keep track of them?  Count them?
13 A. At the time, yes.  Whenever they were turned in, yes,
14   but since then, no.
15 Q. How many did you turn in?
16 A. All of that I had.
17 Q. But you don't know what the quantity was as we sit
18   here today?
19 A. As I stated, at this time, no.
20 Q. Did you ever make a note of what the quantity was?
21 A. No, sir.
22 Q. And when you turned them in, you turned them in
23   where?  To who?
24 A. To the controller at NeXus because I was term- -- I
25   was laid off.

---

Page 68

1 Q. You were laid off?
2 A. We've already been through this.  Yes, sir.
3 Q. I misunderstood.  I apologize.
4     Were you laid off at the time that you did the
5   inspection?
6 A. I was laid off afterwards.
7 Q. Afterwards.
8     Were you laid off at the time you wrote your
9   report up and gave it to them?
10 A. The first sections of it, no.  The final, yes.
11 Q. There was a first section piece that you had done,
12   and then there was a final version; right?
13 A. Yes.
14 Q. Okay.  The final version, is that the two-page one
15   we have?
16 A. Yes, sir.
17 Q. Okay.  And that final version was given to NeXus at
18   a time when you were no longer employed by NeXus;
19   right?
20 A. Well, I stated that incorrectly.  It was with
21   everything at the time, but it was done roughly.
22   They finished it.  Or somebody typed it out or
23   however that happened.
24     I have it and typed it out myself.  But it was in
25   my notes and my paperwork, yes.

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 73

1  BY MR. BURGE:
2  Q. And at the time you turned in that finished
3     two-page one that has the stationary inspection --
4  A. Uh-huh.
5  Q. -- on it, when you turned that in, you had already
6     been laid off by NeXus by that point?
7  A. I turned it in the day that I was laid off, with the
8     videos.
9  Q. So you were laid off. Then you gave them the
10    report and the videos, and then you left; right?
11 A. Correct.
12 Q. Would you agree with me that your inspection of the
13    RV included more than what you took videos of?
14    More happened?
15 A. Yes.
16 Q. Including the scale weighting events; correct?
17 A. That's correct. I did not -- that was not --
18 Q. I'm going to show you Exhibit 4. We already have
19    a 4. So we'll call this Exhibit 4A.
20    (Plaintiffs' Exhibit No. 4A marked.)
21    THE WITNESS: I can't read that.
22 BY MR. BURGE:
23 Q. Yeah, it's a little hard to read.
24    Well, actually, if you look at it, I think that
25    you can probably --

---

Page 74

1  A. Not where the fingerprint's at, I can't read. "83,"
2     and I can't read what's afterwards.
3  Q. You can tell that that is -- there's a bigger copy.
4     You can tell that that is a sticker dealing with
5     motor home weight; right?
6  A. Yeah.
7  Q. Did you look on the RV during your inspection for a
8     similar such sticker?
9  A. Yes. I believe that it was in one of the videos.
10 Q. You're sure?
11 A. No, I'm not sure.
12 Q. Do you recall taking a video of the sticker?
13 A. I seem to recall that, yes. But I'm not 100-percent
14    sure.
15 Q. If you took it, then it would be on one of these
16    videos that we have; correct?
17 A. Yes. And if it's not there, then I did not.
18    I don't recall. I think I did.
19 Q. Did you actually see the sticker that was on this
20    vehicle at the time you were doing the inspection?
21 A. I can't recall. I can't recall, sir.
22 Q. You don't recall one way or the other; sir?
23 A. No, I do not.
24 Q. Do you recall for certain whether you even looked
25    for it on this RV at the time of your inspection?

---

Page 75

1  A. Yes, I do.
2  Q. And did you look for it?
3  A. Yeah, behind the driver -- I don't remember if I got
4     it or not.
5  Q. This says that the combined weight of occupants and
6     cargo should not exceed 1550 pounds. Do you know
7     where this sticker comes from and who puts it on
8     the RV?
9  A. Yes.
10 Q. Who?
11 A. This is done over when the vehicle's completed at
12    NeXus.
13 Q. Who creates the sticker?
14 A. The person that does the PDI and the weights and all
15    that sort of stuff.
16 Q. They print it out and then affix it to the chassis?
17 A. Yes, sir.
18 Q. Someplace?
19 A. Someplace.
20 Q. But it's done by NeXus itself?
21 A. That's correct.
22 Q. Have you ever seen how this sticker gets created at
23    NeXus?
24 A. No.
25 Q. So you only know by way of what somebody's told

---

Page 76

1     you. Is that right?
2  A. Whatever's documented is what -- what I go by.
3  Q. What does that mean, "whatever's documented"?
4  A. Just what I said, if it's documented, it says this,
5     this, or this, that's what I go by.
6  Q. But what does that mean? I don't understand what
7     you -- what you're telling me.
8  A. What are you asking me?
9  Q. How is it documented?
10 A. The numbers that are affixed or given put on the
11    sticker --
12 Q. Okay.
13 A. -- be it the weights or whatever the case may be. If
14    that -- if it says 830 pounds or whatever it may be,
15    that's what I go by.
16 Q. Okay. So you go by what's on the sticker?
17 A. Yes, sir.
18 Q. Okay. So you assume the sticker's accurate?
19 A. I do.
20 Q. But you're not there when the actual weighing
21    occurs --
22 A. No.
23 Q. -- typically; right?
24 A. No.
25 Q. And you're not there when the actual sticker is

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

| Page 77 |
| --- |

1    created; right?
2 A.   That's correct.
3 Q.   Do you even know who -- what employee actually does
4    that at NeXus?
5 A.   At this point in time, no, sir.
6 Q.   Did you even know back then?
7 A.   No. Like I said, this was --
8 Q.   It's not your department; right?
9 A.   That's correct.
10     (Plaintiffs' Exhibit No. 5A marked.)
11   BY MR. BURGE:
12 Q.   We'll call this 5A. If you take a look at that, do
13    you know where that's even located on the RV
14    itself?
15 A.   It appears to be a water fill hose, but where it's
16    located on this particular one, no, I don't know.
17 Q.   You see the holes in it?
18 A.   I do.
19 Q.   In your experience is that normal?
20 A.   No.
21 Q.   It's not the way it's supposed to be made; right?
22 A.   That's correct.
23 Q.   If it's made like that, could that be a defect in
24    material or workmanship coming out like that?
25 A.   Material for sure.

| Page 78 |
| --- |

1     (Plaintiffs' Exhibit No. 10 marked.)
2   BY MR. BURGE:
3 Q.   Show you Exhibit 10. I'll tell you that that's a
4    photograph of a propane line.
5     You see the hole?
6 A.   I do.
7 Q.   It's not supposed to be like that; right?
8 A.   That's correct.
9 Q.   Would that be a defect in material or workmanship?
10 A.   Yes, it would.
11 Q.   How could that kind of a thing happen in the normal
12    construction process?
13 A.   I'd have to guess. I don't know for sure.
14 Q.   And the hole we saw in the waterline, how could
15    that kind of thing happen in the normal
16    construction process?
17 A.   Same answer.
18 Q.   Explain for me this cantilever thing that you talk
19    about in your report. I have to admit, I don't
20    understand what you're saying.
21 A.   You have a mid point balance in the vehicle.
22 Q.   "Mid point balance," what does that mean?
23 A.   You have 50 percent front and rear.
24 Q.   Okay. You're talking literally the front and rear
25    of the RV?

| Page 79 |
| --- |

1 A.   Yes, I am.
2 Q.   "50 percent," meaning what?
3 A.   In the middle.
4 Q.   Oh, a 50-percent point where half of the weight is
5    in front and half in back?
6 A.   Yes, sir.
7 Q.   Thank you. Go ahead.
8 A.   Okay. You can actually take -- in this particular
9    case the water tank is in the rear of the vehicle.
10    It's on the rear half. You can literally put weight
11    in the back of the vehicle and lighten up the front
12    half of the vehicle, so that depending on how you
13    weigh -- or how you load the vehicle, you can
14    alleviate some -- or give yourself extra weight in
15    different areas.
16 Q.   Do you agree that without doing that, part of it
17    exceeds the chassis maximum standards?
18 A.   No, not at all.
19 Q.   But when you put people in the RV, does it?
20 A.   No.
21 Q.   If you put luggage or -- or cooking things --
22 A.   As I stated --
23 Q.   -- food, whatever, you can reach a point where part
24    of the RV, front or back, is exceeding the weight
25    limitations of the chassis. Is that right?

| Page 80 |
| --- |

1 A.   Only if you load it wrong.
2 Q.   What do you mean "load it wrong"?
3 A.   Only if you put too much payload in there.
4 Q.   Too much what?
5 A.   You have a specific amount available to you, period.
6    You can't make any more. You can't create any more.
7    But you can adjust those numbers by how you load
8    and -- load the vehicle. But you can only put
9    X amount in there before you overload the vehicle.
10 Q.   So you can only put X amount in the overall RV --
11 A.   Uh-huh.
12 Q.   -- before you over load the overall rating;
13    correct?
14 A.   That's correct.
15 Q.   Okay. And you can only put X amount in front
16    before you overload the front rating; correct?
17 A.   That is correct.
18 Q.   And you can only put a certain amount in the back
19    before you overload the back; right?
20 A.   That is correct.
21 Q.   That sticker that you were talking about that you
22    thought that you had photographed but you're not
23    positive whether you did or didn't, it doesn't talk
24    about front or back; it just talks about the
25    overall maximum. Right?

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 81

1 A. That's correct.
2 Q. And the cantilevering you're talking about, can you
3    explain what you mean by that in terms of this RV
4    and loading it?
5 A. You can -- as I stated, you can actually improve or
6    add to the weight that you put on the front or the
7    rear by where you stack or where you place the
8    payload on the inside.
9      So if you were to take -- in the back you have --
10    there's plenty of axle left over on that one,
11    1120 pounds.  You can take and put a little weight on
12    the back of it after the rear axle and it will
13    actually help lighten up the front end and lighten
14    things up that way.
15      I'm not talking massive amounts of weight, but
16    I'm talking about, you know, 15, 20, 30, maybe even a
17    hundred pounds, depending on which you need to work
18    with.
19 Q. That would also depend on the distance to the
20    middle point; right?
21 A. No.  Depends on where the axle's at, where you put
22    the weight.
23 Q. Okay.  So if I understand you correctly -- and
24    please correct me if I'm wrong -- what you're
25    saying, basically, is that if you have too much

Page 82

1    weight in the front, you just move it to the back?
2 A. No.
3 Q. And it sort of shifts the center or it shifts the
4    weight.  Is that right?
5 A. To a point.  But my first and most important
6    statement was it only -- you can only put X amount in
7    there to start with.
8 Q. The total?
9 A. Yes.
10 Q. Okay.
11 A. You can -- if you want to put, you know, 2,000 pounds
12    into a vehicle, you cannot if it only has an
13    available payload of 830 pounds.
14 Q. Why not?
15 A. Because that's all that's available to you.
16 Q. You've got lots of compartments in it, though?
17 A. Doesn't matter.  You still can only put X amount in
18    there.
19 Q. Then why do we have all the compartments in there?
20 A. So you can put stuff in there when you're sitting
21    still.
22 Q. While you're sitting still?
23 A. Whatever you want to do.
24 Q. So you can put stuff in there while you're sitting
25    still, but not while you're moving.  Is that right?

Page 83

1 A. You can do whatever you want with the information
2    available.  You can take and put X amount of pounds
3    anywhere you want in a vehicle, but you cannot exceed
4    the weight that's available to you, period.
5 Q. One of the -- what are the things that affect that
6    weight?
7 A. Axle ratings and what you have left.  What do you
8    mean?
9 Q. What's left?
10 A. What's the question?
11 Q. The axle rating establishes the maximums; right?
12 A. That's correct.
13 Q. Okay.  And it's the maximum for each axle and then
14    the overall maximum for the entire chassis; right?
15 A. Uh-huh.
16 Q. What affects the weight that is put on those?
17 A. The weight of the vehicle before you load it.
18 Q. What is made up of the weight of the vehicle before
19    you load personal items --
20 A. Everything that's --
21 Q. -- before you load personal items into it?
22 A. Okay.  Understood.
23      You know, when you get a completed vehicle,
24    before you load it or do anything to it, when it goes
25    through the PDI, they make that little sticker that

Page 84

1    you have.  It gives you a certain amount of weight
2    that you can add to the vehicle.
3      That sticker was on there before the vehicle was
4    purchased.  It was common knowledge beforehand.  All
5    you had to do -- you had --
6 Q. What kind of common knowledge?
7 A. Just -- it's on there if you were to look and see the
8    vehicle.
9 Q. Where is it on the vehicle?
10 A. It says right on there.
11      THE REPORTER: One at a time.
12   BY MR. BURGE:
13 Q. Where's it on the vehicle?
14 A. I don't know where it's on this particular vehicle.
15 Q. Okay.  Go ahead.
16 A. I stated that earlier.  Okay?
17 Q. Okay.
18 A. But you have -- that information's available to you.
19    But how much weight you can actually put in the
20    vehicle, it's on that sticker, wherever it may be.
21 Q. Okay.
22 A. You can't exceed that.
23 Q. That's -- all right.  Go ahead.
24 A. So you can sometimes adjust that amount of weight in
25    the front or the rear of the vehicle to add or

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 85

1   subtract from an axle.
2  Q. Okay.  So you load -- your cantilever theory that
3     you're talking about in your report?
4  A. Uh-huh.
5  Q. You know what I mean; "yes"?
6  A. Yes, sir, I do.  Sorry.  I had water in my mouth.
7  Q. Quite all right.
8     Your theory of that is that if one end is
9     heavier, then it ought to be you just move stuff to
10    the back.  Is that right?
11 A. That's not what I said at all, and it's not my
12    theory.
13 Q. Well, that's what I'm trying to understand --
14 A. Okay.
15 Q. -- how this cantilever thing works that you're
16    talking about.
17 A. Once again, if you have the weight where you can put
18    in the rear of the vehicle, you can lighten the front
19    of the vehicle.  And it's not -- it's by whatever --
20    you -- I can't give you specific, you know, numbers,
21    but I can tell you that if you were to take -- put
22    300 pounds in the back of the vehicle and you would
23    weigh, you could actually see a physical difference
24    in a lightening of the front half of the front end --
25    the front axle.

---

Page 86

1  Q. Even if you don't move anything out of the front
2     axle area?
3  A. That's correct, yeah.
4  Q. Just simply overloading into the back area --
5  A. No, not overloading.
6  Q. Well, loading into the back area will reduce the
7     amount of weight on the axle in the front.  Is that
8     right?
9  A. It can.
10 Q. It can or it does?
11 A. It does depending on how much.  Like I said, it could
12    be -- it could be 2 pounds.  It could be a lot,
13    depending on how much you put in there.
14 Q. What do you mean 2 pounds?
15 A. All right.  I'm -- however much weight you want to
16    put in the back does not specifically tell you how
17    much you get in there.  It's a percentage of
18    improvement from one to the other.
19 Q. What's the percentage?
20 A. I don't know.  A specific --
21 Q. How do we determine what percentage?
22 A. It's specific to that particular situation.
23 Q. How do we determine what the percentage is of
24    relief that is given to the front axle when we put
25    weight into the back axle?

---

Page 87

1  A. By physically doing it and weighing it as you do it.
2  Q. Then it's not a percentage.  It's amount of pounds;
3     right?
4  A. Well, yes.
5  Q. So you put so many pounds in the back and it relieves
6     so many pounds in the front.  Is that what you're
7     saying?
8  A. That is correct, yes.
9  Q. So it's not a percentage; right?
10    There's a difference between what is a
11    percentage and what is a precise amount of pounds.
12    So I'm trying to figure out which way it is that we
13    look at it to figure it out.
14 A. There is a percentage.  I would need the formula;
15    okay?
16 Q. Is there a formula?
17 A. Yes, there's a formula and I do not have it with me,
18    nor do I know where it's at.
19 Q. Where's does the formula come from?
20 A. Probably from an engineer.
21 Q. "Probably"?  You don't know where it comes from?
22 A. I'll finish my answer from before.  If you take and
23    you put weight in the back, as I stated, it will take
24    and alleviate some of the weight on the front.
25    Is it by poundage, whatever?  I don't know.  You

---

Page 88

1     would have to check and see, but you would also --
2     you would have to do it on weights on a scale in
3     order to see the difference made.
4  Q. You don't know who created the formula you're
5     talking about?
6  A. No, I do not.
7  Q. You don't know what the elements of a formula are,
8     do you?
9  A. At this point in time?  No, I don't.
10 Q. You don't know how the formula is applied to the
11    weights that are involved in order to arrive at the
12    percentage that you're talking about; right?
13 A. It's a manual process and I just told you how we do
14    it.
15 Q. How do we do it?
16 A. Once again, for the third time, we take and you
17    literally take the weight and move it and see what
18    difference it makes on the front or the rear.
19 Q. So what is the maximum that you can put on the rear
20    axle without violating that and cantilevering the
21    weights that are put on the front according to the
22    formula?
23 A. It depends on what the weights are to start with.
24    The variables change constantly.  No two vehicles
25    weigh exactly the same, even if they're identical.

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

Page 89

1 Q. What variables are we talking about that change
2 constantly?
3 A. The weights of the overall vehicle.
4 Q. And that's according to what?
5 A. It's according to knowledge of weighing each vehicle
6 every time.
7 Q. Actually, it's according to what you put in the
8 vehicle, correct, by the manufacturer when they
9 first build it?
10 A. No.
11 Q. That doesn't matter?
12 A. It varies -- well, of course it matters, but it
13 varies. You could have two -- never mind. I don't
14 even want to talk about that.
15 Q. Well, when you said "variable," that's what I'm
16 trying to understand. What are the variables
17 you're talking about?
18 A. When you put a coach together, something like that,
19 options, changes like that, different interiors --
20 I'm sorry. I have to -- I've got to think
21 differently when I'm speaking with you. My
22 apologies.
23 Q. No -- no problem. Go ahead.
24 A. But it's --
25 Q. I'm not -- I don't have any experience in this.

Page 90

1 This is why I'm trying to understand.
2 A. Okay. Fair enough.
3 No, if you have different options in place, if
4 you have different countertops, if you have different
5 cabinetry, you know, different doors, a lot of things
6 will make a difference. You know, a fiberglass tub
7 as opposed to a plastic tub. You can have a hundred
8 pounds difference in just those two.
9 Q. So what you put into the RV as you build it is
10 going to have an impact on where the weight
11 distribution is between the front and the rear
12 axle --
13 A. Without question, yes.
14 Q. -- correct?
15 A. Yes, sir.
16 Q. And also, it will have an impact on how much weight
17 is left for any passengers and cargo; right?
18 A. Correct.
19 Q. And it will also have an impact on the
20 cantilevering that you were talking about for
21 purposes of placing cargo in the RV, too; right?
22 A. Yes.
23 Q. And how much you're putting in the front as opposed
24 to the back will also have an impact on the
25 cantilever you're talking about in the RV; right?

Page 91

1 A. Sure.
2 Q. Anything besides the cargo and the bathtub or
3 whatever you're putting into the RV as you build
4 it?
5 A. No, sir.
6 Q. If you over load it or if the cantilevering isn't
7 done right -- I guess that's what I'm getting at.
8 If the cantilevering isn't done right, what's the
9 impact on the RV itself as you try to use it or
10 drive it down the road or whatever? Do you know?
11 A. Huh-uh.
12 Q. That's a "yes" or a "no"?
13 A. No.
14 Q. Thank you.
15 Is there anything that you are aware of that
16 NeXus has in place to prevent to the building by
17 NeXus of an RV that exceeds the maximum ratings?
18 A. No.
19 Q. Your report talks about your pretrip inspection and
20 you had mentioned you opened the hood and you
21 checked fluid levels. In fact, your report says,
22 "Checked all accessible fluid levels."
23 What fluid levels did you check there? You
24 mentioned engine oil because that was low.
25 Anything else?

Page 92

1 A. Transmission. And then the -- just physical look at
2 the bottle of the brakes and the -- the water, to
3 make sure it was there. That's all.
4 Q. The water in the?
5 A. Sorry, the windshield washer fluid.
6 Q. Oh, okay.
7 Your report says that Michelle Rosa assisted
8 in the weighing of the unit. She actually did the
9 weighing herself; right?
10 A. I did the weighing. She stayed inside and talked to
11 me over the intercom and told me when to move it so
12 she could get it printed out properly.
13 Q. You moved around on the scale; right?
14 A. I moved the vehicle on the scale.
15 Q. Okay. But in determining what the numbers were
16 from where it was sitting on the scale, that was
17 part of what Michelle Rosa did when she printed it
18 out; right?
19 A. She printed off what the scale told her, yes.
20 Q. Did you actually go see it for yourself or did
21 you -- did you somehow or other see it from where
22 you were sitting?
23 A. No, I could not see it. They didn't have --
24 Q. You just moved it where she said?
25 (Simultaneous cross-talking.)

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 93

1        THE WITNESS: There was no indication
2    of the weights on the outside.
3  BY MR. BURGE:
4  Q. Okay.  She just gave you the printout; right?
5  A. That's correct.
6  Q. Your report says that every pound placed in the
7     rear portion of the vehicle will increase the
8     available weight on the front axle, but it doesn't
9     say by how much or anything.  And that's that -- we
10    don't know that, do we?
11 A. We have to physically, you know, add a pound and see
12    what it -- what it actually takes off the front, like
13    I stated.
14 Q. And you've never done that; right?
15 A. Sure, I've done that.
16 Q. You have?
17 A. Uh-huh.
18 Q. Did you do it on this RV so you could tell?
19 A. What?
20 Q. Did you do it on this RV?
21 A. No, I did not.
22 Q. Okay.  You say you have done it.  Where -- where
23    and when did you do that?
24 A. Doing an R&D, you know, on units to see what we
25    needed to do in the course of just designing vehicles

---

Page 94

1     just to see where we were at.
2  Q. Explain that for me.
3  A. If you wanted to see if you wanted to have X amount
4     of pounds on the front, you know, if you didn't like
5     the number it was, then you would add weight to the
6     back to see where you would, you know, make a change
7     or you would do a redesign.
8  Q. You say the front axle must allow for 154 pounds
9     per seat belt in the cockpit area.  What does that
10    mean?  154 pounds per seat belt?
11 A. That's the Government number that we have to go by
12    for capacity.
13 Q. What Government number?
14 A. It's a number that the Government note -- NHTSA
15    states that it has to be -- you allow 154 pounds per
16    person.
17 Q. And where does it state that?
18 A. In the NHTSA book, in the Code book.
19 Q. What Code book?
20 A. The NHTSA Code book.
21 Q. What NHTSA Code book?
22 A. You'll have to look it up.  I don't have one.
23 Q. You know what the name of the book is?
24 A. Yeah, it's the NHTSA Codes, all their -- the Codes
25    that are necessarily required by law.

---

Page 95

1  Q. Safety Codes?
2  A. Yes, sir.
3  Q. Do you know how many there are?
4  A. Many, many, many, many, many --
5  Q. That's why I asked you which one.
6  A. -- many, many.  I don't know that number.
7  Q. Have you ever looked it up yourself?
8  A. Oh, yes.
9  Q. When was the last time you looked it up?
10 A. When I was employed.
11 Q. At NeXus?
12 A. Yes, sir.
13 Q. You talked about doing that analysis before.  Have
14    you done that kind of a cantilevering analysis on
15    this RV?
16 A. No.
17 Q. It sounds like what you're basically saying is that
18    if there's too much weight in the front, you can
19    tell your wife to go sit in the back and that will
20    balance it perfectly fine.  Is that right?
21        MS. HUNNESHAGEN: Objection.
22        Mischaracterizes prior testimony.
23        Go ahead.
24 BY MR. BURGE:
25 Q. Is that what you're saying, that that -- that that

---

Page 96

1     would basically be correct, you could do that and
2     fix the overweight in the front?
3        Go ahead.  She put her objection.  You go
4     ahead and answer it, if you can.
5  A. Technically, yes.
6  Q. Have you ever seen in any brochure by NeXus telling
7     anybody who's interested in buying an RV that if
8     there's too much weight in the front, you can tell
9     your wife to go sit in the back?
10 A. No, sir.
11 Q. Have you seen published anywhere this -- any kind
12    of study or analysis done by any engineer or
13    scientific person relating to the cantilever
14    affecting that you're -- the cantilever thing that
15    you're talking about with this RV?
16 A. I have, but I don't recall where that was.
17 Q. Don't know where that was?
18 A. No, sir.
19 Q. Don't know who did it?
20 A. Huh-uh.
21 Q. Don't know when you saw it?
22 A. Nope.
23 Q. Are you sure you even saw it?
24 A. I'm positive.
25 Q. So you're sure you saw it, but as we sit here

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 97

1  today, you can't tell me where to go to look to
2  find it; right?
3  A. That's correct.
4  Q. And you can't tell me when you saw it; right?
5  A. Stated.
6  Q. And you can't tell me the last time you saw it;
7  right?
8  A. That would be correct.
9  Q. And you can't give me the name of any person that
10  ever has written such an analysis; right?
11  A. That is correct as well.
12  Q. And you cannot give me the name of any institution
13  or scientific body that has ever done such an
14  analysis, can you?
15  A. Stretch it out as long as you will, the answer is no,
16  I do not.
17  Q. Can you give me the name of any publication
18  anywhere relating to RVs that explains for the
19  owner this cantilevering process of weight shifting
20  that you're talking about?
21  A. No.
22  Q. At the time you looked at this RV, did it have the
23  original tires on it that came from the factory or
24  do you know?
25  A. Stated in the paperwork before, I went and looked at

---

Page 98

1  the vehicle, that they were changed.
2  Q. Did that have any affect on the cantilevering or on
3  the weight?
4  A. No. I don't -- there might have been different
5  weight on the tires, but I did not -- you know, I
6  went by the overall weights that were given, so I
7  don't know if there was a difference or not.
8  Q. The weight of the RV as it was being measured at
9  that facility where you took it included the weight
10  of the tires; right?
11  A. That's correct.
12  Q. Does the weight of the tires have any affect on the
13  chassis maximum numbers?
14  A. Their overall weight rating as far as what they can
15  handle.
16  Q. The chassis -- well, yeah, the overall rating of
17  the tires; correct?
18  A. Yep. Yeah.
19  Q. Okay. But the tires don't add or subtract anything
20  to the chassis maximum capacity; right?
21  A. Oh, no. No. No. No.
22  Q. Because the chassis sits on the tires; right?
23  A. Not only that, but the chassis and tires are figured
24  as one complete unit.
25  Q. Yeah. So you can change the tires to bigger tires,

---

Page 99

1  smaller tires, heavier tires, lighter tires, and
2  it's not going to have any affect on what your
3  rating is for the chassis itself; right?
4  A. I believe so.
5  Q. You just might have a hard time driving it,
6  depending on if you have flat tires; right?
7  A. Well, yes.
8  Q. All right. You were inside this RV for
9  approximately how much time, totally? You look
10  puzzled. Let me start that off and redo that
11  question. That's a little fuzzy. I apologize.
12     If you -- if your inspection lasted an hour
13  and three-quarter -- you talked about driving
14  around some, too.
15  A. Uh-huh.
16  Q. Okay. If it's an hour and three-quarter beginning
17  to end, about how much of that do you think you
18  were actually inside the RV?
19  A. Probably about 30 minutes.
20  Q. Can you tell me how many seat belts are inside?
21  A. Six.
22  Q. And the weight accommodated to each seat belt is
23  how much? 154, was it?
24  A. Uh-huh.
25  Q. Who determines how many seat belts to put inside

---

Page 100

1  the RV?
2  A. Sleeping conditions. How many people it will sleep
3  is how many you put in there.
4  Q. Who determines the sleeping conditions to be put
5  into the RV?
6  A. The design.
7  Q. Who does the design of the RV?
8  A. We do.
9  Q. NeXus; right?
10  A. Yes.
11  Q. So NeXus decides how many seat belts are going to
12  be for passengers inside the RV; right?
13  A. You have to have a seat belt for every place you can
14  sleep.
15  Q. Am I right that NeXus decides it?
16  A. Yes.
17  Q. Thank you.
18        MR. BURGE: Let's take another break
19     for a couple minutes. Then I think we'll
20     wrap up; okay?
21        THE WITNESS: Okay, sir.
22        (Off the record.)
23  BY MR. BURGE:
24  Q. What's the normal occupancy expected for this RV
25  from your review of the RV?

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 101

1 A. The normal occupancy. It could be whatever you want
2    it to be as long as you stay within the weights.
3 Q. I know that, but my question is the normal
4    occupancy expected?
5 A. I don't own it. I don't know what the normal
6    occupancy is.
7 Q. Well, NeXus built it. Did they in your review of
8    it --
9 A. They gave you the opportunity --
10    (Simultaneous cross-talking.)
11   BY MR. BURGE:
12 Q. -- that they had an occupancy level in mind for
13    this RV in the design and construction?
14 A. Sure.
15 Q. What was that?
16 A. Up to.
17 Q. "Up to" what?
18 A. Up to six.
19 Q. Six people?
20 A. It doesn't mean (inaudible) six in there. It just
21    means it's up to six people.
22 Q. Did you talk to anyone during the break today?
23 A. I talked to everybody during the break today.
24 Q. About any of the testimony?
25 A. Testimony, no. Just trying to --

---

Page 102

1 Q. Is there anything you want to add to your report as
2    we sit here now?
3 A. No. I think I've got enough. Thank you.
4 Q. Is there anything you want to change in your
5    report --
6 A. Oh, not at all.
7 Q. -- as we sit here now?
8    Let me finish my question, please.
9 A. Okay. Go ahead.
10 Q. Is there anything you want to add to or change with
11    your written report, the two-page report?
12 A. No.
13 Q. Is there anything you want to add to any of the
14    answers or change to any of the answers you've
15    given to any of the questions today?
16 A. No, sir.
17 Q. This cantilevering that you're talking about, you
18    cannot tell me where to go to find any of the
19    scientific research or information that supports
20    this theory; correct?
21 A. That's not what I stated. What I stated was I did
22    not know where or specifically have information to
23    where it was gotten.
24 Q. And that wasn't my question. My question is: You
25    cannot tell me where to go to look at any of this

---

Page 103

1    scientific analysis or testing that supports this
2    cantilever theory that you're talking about in your
3    report. Am I correct?
4 A. No, I can't give you -- I can't give you any
5    specifics. That's correct, sir.
6 Q. Thank you.
7        MR. BURGE: That's all I have. I
8    appreciate your time today.
9        THE WITNESS: No problem.
10        MR. BURGE: I wish somebody was
11    paying you besides that modest fee I gave
12    you.
13        MS. HUNNESHAGEN: I have just a
14    couple questions for you.
15        THE WITNESS: Yes, ma'am.
16        CROSS-EXAMINATION
17   BY MS. HUNNESHAGEN:
18 Q. Early on in your deposition testimony Mr. Burge
19    asked you what you did to prepare for your
20    deposition. You stated you had spoke with your
21    wife. Is that correct?
22 A. Yes.
23 Q. Did you also meet with anyone immediately before
24    your deposition?
25 A. No.

---

Page 104

1 Q. Did you meet with Mr. D- -- Mr. Da- --
2 A. Well, yes, I did.
3 Q. Okay. So who did you meet with?
4 A. Mr. Donati and with you.
5 Q. Okay. And how long have you worked in the RV
6    industry?
7 A. Goodness, 23, 24 years.
8 Q. So would you say that most of your training has
9    been on the job?
10 A. I would say a vast amount of it, yes.
11 Q. And you also have some certifications that were
12    listed on your resume?
13 A. I do.
14 Q. Do you believe that those contribute to your
15    ability to testify as an expert here today?
16 A. I absolutely do.
17 Q. Prior -- previously in your deposition testimony
18    Mr. Burge had asked you about your training at
19    NeXus and you indicated that they did not provide
20    any training for you. Is that correct?
21 A. Nothing specific for me, no.
22 Q. Okay. And why do you believe that was?
23 A. Because I have the knowledge necessary to do what
24    they ask me to do.
25 Q. And why do you believe that you're qualified to

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 105

1    testify as an expert here today?
2 A.  Because of my years of working with RVs, both
3    designing, building, and modifying that makes me
4    qualified to do so.
5 Q.  Your certifications also contribute to that?
6 A.  Yes.
7 Q.  Can you explain what the difference is between a
8    four-corner scale and a CAT scale?
9 A.  CAT scale is merely a platform scale that you can by
10    placement of a vehicle get either an overall weight
11    or specific weight.  What I mean by that is a front
12    axle or rear axle.
13      4-corner weight would give you each corner,
14    specific weights.
15 Q.  Okay.  You stated that during the inspection you
16    performed that several videos were taken?
17 A.  Yes.
18 Q.  Do you believe that those videos show the condition
19    of the RV?
20 A.  I do.
21 Q.  So so they relate to the inspection of the RV?
22 A.  I'm sorry?
23 Q.  Do the videos relate to the inspection of the RV?
24 A.  Yes.
25 Q.  There was previously discussion about the tires in

---

Page 106

1    relation to the chassis.
2      Do you recall that?
3 A.  Mr. Burge brought it up, yes.
4 Q.  So the tire -- is it my understanding that the
5    tires will not affect the overall carrying capacity
6    of the chassis?
7 A.  Technically you can have -- tires can -- depending on
8    their construction, can actually add to, you know,
9    the capacity of a vehicle.  But what I understood him
10    to ask me was the physical weight of a tire, will
11    that make a difference in a chassis?  And that --
12 Q.  Will the actual tires -- so -- when you weighed the
13    RV, you weighed it on CAT scale?
14 A.  Yes.
15 Q.  If there were bigger tires on the unit, will that
16    affect the overall weight that comes up on the
17    scale?
18 A.  Yes.
19      MS. HUNNESHAGEN: Okay.  I have no
20    further questions.
21      REDIRECT EXAMINATION
22 BY MR. BURGE:
23 Q.  But it does not affect the capacity limitations of
24    the chassis itself?
25 A.  No.

---

Page 107

1 Q.  The 4-corner versus a CAT scale.
2 A.  Uh-huh.
3 Q.  The two different kinds of weighing, do you know
4    why there are two different kinds?
5 A.  Sure.  If you're going to go through -- you want to
6    make sure when you're checking a vehicle of any type
7    to make sure that you don't have one corner or
8    another overloaded, be it the left, right, front,
9    rear, whatever the case may be, you want to make sure
10    you're within tolerance and spec with every corner
11    and you do that by 4-corner weights.
12 Q.  The 4-corner scale, so to speak, as opposed to the
13    CAT scale approach, the 4-corner is more accurate;
14    correct?
15 A.  Yes.
16 Q.  And the CAT scale itself you literally are putting
17    the front of the vehicle on the scale in order to
18    determine the front axle; correct?
19 A.  Correct.
20 Q.  And you put the back on and not the front in order
21    to determine the back axle; right?
22 A.  Correct.
23 Q.  What certifications do you have and where do they
24    appear on Exhibit 4, the resumé?  I must apologize.
25    I did not see any.  Maybe I'm just --

---

Page 108

1 A.  There you go.  It's under "Education" on the back
2    page.
3 Q.  Where is it?  Oh, the "Education" at the bottom
4    here?
5 A.  Yeah.
6 Q.  Those are certifications?
7 A.  It's where education comes in.
8 Q.  Six Sigma doesn't have anything to do with this
9    case, right, your Six Sigma certification?
10 A.  The process of why I go about things, it certainly
11    does.
12 Q.  So that Six Sigma certification contributed to your
13    inspection how?
14 A.  The way you go about troubleshooting and looking at
15    an issue.
16 Q.  How?  What difference did it make?
17 A.  It enlightened me to look at more things than I would
18    have otherwise.
19 Q.  And in this case what did you look at that was more
20    things than you would have otherwise?
21 A.  It's hard to say because I already had that
22    information.
23 Q.  Can you tell me anything that you looked at that
24    you would not normally have looked at without Six
25    Sigma training?

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 109

1 A. I don't know because I already had it. I can't --
2    can't answer that question.
3 Q. Well --
4 A. No. The answer is no.
5 Q. Okay. So you cannot tell me; right?
6 A. Yeah. Doesn't mean that -- never mind. No.
7 Q. Okay. Your description of it here does not say
8    anything at all about certification. It just
9    simply says it's a course you went through.
10 A. And got certified for it.
11 Q. Where's the certification mentioned in here?
12 A. Don't have it.
13 Q. It's just a course you went through; right?
14 A. No. It was certified afterwards.
15 Q. Then why didn't you say certified in this, that, or
16    the other thing for any one of these three?
17 A. Well, if you can read, you would have seen it was on
18    the resumé.
19 Q. I'm reading it. It ain't there. The word
20    "certification" isn't there, is it?
21 A. No.
22 Q. Thank you.
23       The Advanced Manufacturing Occupations, that's
24    a course you went through; right?
25 A. Yes.

---

Page 110

1 Q. And what difference did that make to your
2    inspection process that you did with this RV?
3 A. It made me a better all worker and a better all
4    inspector and a better all troubleshooter.
5 Q. But can you specifically say what you did do that
6    you would not have done without having taken the
7    course in Advanced Manufacturing Occupations?
8 A. No.
9 Q. It has to do with occupations in the manufacturing
10    industry; right?
11 A. Yeah, and how you go about it.
12 Q. The, "Continuous improvement processes at Gulf
13    Stream," can you tell me how that contributed to
14    the inspection you did here?
15 A. No.
16 Q. There's nothing here about certification leader on
17    that. It's a course you went through; right?
18 A. It was a certification.
19 Q. You got a certification at the end that you --
20 A. I did.
21 Q. Let me ask the question; would you?
22 A. Go ahead.
23 Q. You went through the course and you got a
24    certification?
25 A. Uh-huh.

---

Page 111

1 Q. A piece of paper that says you went through the
2    course; right?
3 A. That's a fact.
4 Q. You went through the Advanced Manufacturing
5    Occupations course and you got a certification at
6    the end that said you went through the course;
7    right?
8 A. That's a fact. Three-ring folder.
9 Q. You went through the Six Sigma course and you got a
10    certification at the end that said you went through
11    the course; right?
12 A. Yes, that and the green belt.
13 Q. Now, do you have any mechanical certification by
14    RVIA?
15 A. No.
16 Q. Do you have any mechanical certification by SAE?
17 A. No.
18 Q. Do you have any mechanical certification by
19    anybody?
20 A. No.
21 Q. Do you have any certification or training that you
22    have received with regard to this cantilever theory
23    that you've been talking about?
24 A. No.
25 Q. What testing can be done in order to determine the

---

Page 112

1    validity of the cantilever theory that you're
2    talking about?
3 A. I already told you that. Take it and physically
4    weigh it by moving weights from one end to another to
5    see what it does.
6 Q. Did you do that with this RV?
7 A. No, I did not.
8 Q. Any other testing to prove this theory's existence
9    and validity?
10 A. No.
11 Q. Before you went to this inspection, you knew that
12    you were going to be videotaping; right?
13 A. The day before.
14 Q. And yet the only recording device of any type that
15    you took with you was just your phone; right?
16 A. Yep.
17 Q. And apparently your phone wasn't even fully charged
18    or it wouldn't have run out; correct?
19 A. It wasn't a matter of fact of fully charged. It ran
20    out of memory. It was full.
21 Q. Just with the videos you took filled it up --
22 A. That's correct.
23 Q. -- and you couldn't do any more?
24 A. That is correct.
25 Q. How long have you had that phone?

---

Linda Smith, et al. vs.
NeXus RVs, LLC, et al.

Michael Potis
October 23, 2019

---

Page 113

1 A. I have a new one now.
2 Q. When you had that phone, how long had you had that
3     phone?
4 A. 7 -- 6, 7 years.
5 Q. Had you recorded things before with it, videos?
6 A. Not for this purpose, no.
7 Q. Had you recorded things with it before?  Videos?
8 A. Yes.
9 Q. Thank you.
10       So you knew generally what the capacity of it
11     would be; correct?
12 A. No.
13 Q. No idea?
14 A. No, I never done it.  It's like, let's keep doing it.
15 Q. So you went to this inspection knowing you would
16     have to video things and you didn't know the
17     capacity of the video device you took with you?
18 A. Correct.
19 Q. Did you expect that the inspection could take an
20     hour and a half or more?
21 A. I didn't know what it was going to take.
22 Q. Did you think you were going to be done in
23     15 minutes?
24 A. No.
25 Q. Did you think you would be done in an hour?

---

Page 114

1 A. Pretty close to that, yes.
2 Q. Okay.  Did you know there was a Court Order saying
3     that you were supposed to video the entire
4     inspection beginning to end?
5 A. I was informed that the day before, yes.
6 Q. Then why didn't you do that?
7 A. Because I did the best I could with what I thought
8     was going to work.
9 Q. Then why didn't you request that they give you
10     video equipment that you could do it with?
11 A. I don't have that answer.
12 Q. Did it just not occur to you?
13 A. No.
14 Q. "No," it didn't occur to you?
15 A. No, it didn't occur to me, sir.
16 Q. Did you tell anybody you were just going to use
17     your phone?
18 A. Yes.
19 Q. Anybody say, "Well, you need something better than
20     that"?
21 A. No.
22 Q. Anybody say that you need to take an extra phone?
23 A. No.
24 Q. Anybody offer to give you video equipment?
25 A. No.

---

Page 115

1 Q. Do you know whether or not NeXus has video
2     equipment?
3 A. I do not know that, no.
4 Q. So you went to the inspection knowing there was a
5     Court Order to videotape all of the inspection, but
6     you did not, and your video actually filled up
7     somewhere during the course of it; correct?
8 A. Asked and answered.
9 Q. Am I correct?
10 A. Yes, sir.
11 Q. And, in fact, at the beginning before it was full
12     there were things that you did in your inspection
13     that you did not videotape; correct?
14 A. That is correct.
15 Q. But you could have videotaped those; right?
16 A. I didn't even think about doing that stuff because
17     the videotape was over and above.
18 Q. Over and above what?
19 A. I don't -- when I'm looking and inspecting stuff, I
20     don't generally videotape, so I have to do whatever,
21     like I told you before, one hand.
22 Q. You said that you were told that you had to video
23     record the entire inspection.
24 A. Okay.  Well, I didn't.  I did the best I could with
25     what my phone will allow me to do.

---

Page 116

1 Q. But right at the beginning you could have
2     videotaped your checking of the fluids.
3 A. I did not.
4 Q. But that was part of your inspection; right?
5 A. It was.
6 Q. So you decided what you were going to videotape and
7     what you were not before you ran out of capacity to
8     tape record any more; correct?
9 A. No.  It wasn't a conscious decision.  It's just the
10     way it worked out.
11 Q. Well, because you didn't video it, we really don't
12     have any way of knowing what you did and did not do
13     when you didn't record something, correct, other
14     than you sitting here telling us that you did it;
15     correct?
16 A. Correct.
17       MR. BURGE: Thank you.  I think
18     that's all I have.
19       MS. HUNNESHAGEN: I have nothing
20     further.
21       MR. BURGE: Mr. Potis, I appreciate
22     your time today.
23     THE WITNESS: Thank you.
24       MR. BURGE: Read and sign?  Or waive
25     or what?

---