UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LINDA AND KEN SMITH, <br><br> Plaintiffs, <br><br> v. <br><br> NEXUS RVS, LLC and ALLY FINANCIAL, INC., <br><br> Defendants. | CAUSE NO. 3:17-CV-815 DRL-MGG |

OPINION & ORDER

Linda and Ken Smith purchased a 2018 Phantom recreational vehicle from Nexus RVs, LLC. Although the Smiths have alleged other defects, their paramount concern is that the unit exceeds weight standards and lacks the cargo carrying capacity warranted by the company. Defending against allegations that Nexus breached its warranties or otherwise employed deceptive means in its sale, the company retained Michael Potis, its former employee, to opine on the vehicle's weight and carrying capacity. The Smiths now seek to exclude his testimony as unreliable. The court agrees in part and grants their motion on a limited basis.

BACKGROUND

After the parties conferred under Fed. R. Civ. P. 26(f), the court adopted portions of their discovery plan. The Smiths were required to disclose their experts and reports on October 3, 2018. Nexus was required to disclose its experts and reports on November 5, 2018. The Smiths disclosed Phillip Grismer, and Nexus disclosed Michael Potis.

Mr. Grismer completed an inspection of the Smiths' recreational vehicle without Nexus' counsel present. Nexus attempted to have Mr. Potis inspect the vehicle without the presence of opposing counsel too. The parties couldn't agree on a date for the inspection, so Nexus filed a motion to compel a private inspection. The court granted that motion in part and ordered the Smiths to make

the RV available to Mr. Potis (without opposing counsel present) and ordered Nexus to create a video recording of his entire inspection and serve it on the Smiths along with its proposed expert's report.

The day before Mr. Potis inspected the RV, he was informed that the court ordered him to videotape his entire inspection. He took his phone with him and attempted to use that as a recording device. During his inspection, his phone ran out of memory, and he was unable to videotape the entire inspection. Nexus nonetheless produced sixteen videos to the Smiths equating to less than 5 minutes of his 105-minute inspection.

In his two-page report, Mr. Potis described his inspection process and findings, including his first impressions, pre-trip inspection, driving performance, and the results from weighing the vehicle. ECF 46-3. His inspection consisted of three parts: walking inside and outside the vehicle and examining it for defects, driving the vehicle and testing its function, and weighing the vehicle on a certified CAT scale. The only component of the vehicle Mr. Potis thought didn't function properly was the entry step.

To weigh the vehicle, Mr. Potis drove it to a weigh station and, with the help of an attendant, had three weight measurements taken, one of the front axle, rear axle, and total unit weight. He had never weighed an RV on a CAT scale before, as he normally used a 4-corner scale. The vehicle was weighed with full fuel (461.5 lbs.) and propane (84 lbs.). The front axle weighed 6,680 pounds, the rear axle weighed 11,700 pounds, and the total unit weighed 18,380 pounds. The gross vehicle weight rating (GVWR) allows 7,000 pounds on the front axle, 13,500 pounds on the rear axle, and 19,500 pounds for the total. Accordingly, Mr. Potis concluded as follows:

> Clearly there is enough weight on the rear axle to allow for cantilever action to occur when adding weight to the rear of the coach. The rear axle has an availability of adding 1800 lbs. which will pull weight from the front axle providing more available weight to be placed on the front axle. The available overall cargo carrying capacity of 1120 lbs. is more than sufficient and exceeds industry standards. The front axle must allow for 154 lbs. per seat belt in the cockpit area, which it does and has 12 lbs. remaining. Again, depending on the actual load, every pound placed in the rear portion of the vehicle will increase the available weight on the front axle.

ECF 46-3 at 2. The Smiths filed a motion to exclude his testimony, specifically on the basis that his opinion on the so-called cantilever theory is unreliable.

## STANDARD

Expert opinions must be reliable and helpful. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Appreciating that trial instructions tell jurors to weigh opinion testimony the same as that of ordinary fact witnesses, *see, e.g.,* 7th Cir. Pattern Civ. Jury Instr. 1.21 (rev. 2017), an expert nonetheless enjoys considerable latitude when testifying, *see* Fed. R. Evid. 702-704, and jurors often tend to heed that testimony because of the expert's aura of authority and knowledge, *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018). So the court gatekeeps beforehand. The court decides the testimony's reliability and fitness before the jury ever hears it. *Daubert*, 509 U.S. at 594. This duty extends to all proposed expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education," (2) the testimony is "based on sufficient facts or data," (3) the testimony is "the product of reliable principles and methods," and (4) the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Although the analysis remains at all times flexible, *Daubert*, 509 U.S. at 594, these fundamentals at the start can be restated formulaically just for ease of understanding:

*Opinion + Qualifications + Facts + Validation + Fit = Admissible Expert Testimony.*

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

With opinion in hand, a witness must have credentials or experience that truly denotes the individual as an expert in the relevant field. Experts draw their truths from specialized "experience confessedly foreign in kind to [the jury's] own." Hon. Learned Hand, *Historical and Practical*

*Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 54 (1901). Scientific knowledge may come from professional degrees or use of the scientific method. Other knowledge may presuppose that a person has spent significant time gaining hands-on experience without need of formal education or laboratory work. However obtained, qualifications must provide a foundation for an expert to answer the specific question. *See, e.g., Gayton v. McCoy*, 593 F.3d 610, 617-18 (7th Cir. 2010) (allowing physician to opine about effects of vomiting on body but not pharmacological effects of drugs on heart); *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (allowing agent to opine on *modus operandi* of narcotics dealers based on training and experience in counter-surveillance). Knowledge can be developed in myriad ways. It just can't be "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

An opinion witness must next have a sound factual basis before being declared an expert. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590. Even if eminently qualified, experts cannot offer opinions based solely on their say-so (what lawyers call *ipse dixit*). *See Kumho Tire*, 526 U.S. at 157; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony must be based on sufficient and known facts. Fed R. Evid. 703; *Daubert*, 509 U.S. at 590; *see, e.g., Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (evidence of one sale was an insufficient basis to calculate an average of sales over twenty years); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904-05 (7th Cir. 2007) (excluding expert testimony because the "mere existence of a temporal relationship" was an unreliable basis to show a causal relationship between medication and symptoms).

Expert testimony must also originate from reliable principles and methods. Fed. R. Evid. 702. Scientific testimony may be validated if the theory or technique can be or has been tested, if it has been subjected to peer review and publication, if it has a known or potential error rate, and if it enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. These concerns may or may not bear on technical or experience-based opinions, appreciating that the analysis remains ever nimble to meet their substance, and so long as the witness "employs in the courtroom the same

4

level of intellectual rigor that characterizes the practice of [the] expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *accord Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007).

Expert opinion must last fit the case. Opinions must be tied to case facts and issues. *Kumho Tire*, 526 U.S. at 150. The court must determine whether an expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. The opinion must help the jury decide an issue of consequence. Expert testimony that "does not relate to any issue in the case is not relevant, and . . . non-helpful." *Id.* at 591. A court should exclude testimony unless it speaks, without confusing or misleading the jury, on a relevant issue that the jury must decide. *See* Fed. R. Evid. 403 and 702; *see, e.g.*, *Hartman v. EBSCO Indus.*, 758 F.3d 810, 819 (7th Cir. 2014) (excluding testimony as unhelpful because expert's opinion on alternate design did not assist the jury to decide causation); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 897 (7th Cir. 2011) (excluding testimony as unhelpful because parties agreed to issue). This is what is commonly called fit. *See Daubert*, 509 U.S. at 591.

In short, the Federal Rules of Evidence strike a balance between two competing concerns: the apprehension for the free-for-all admission of unreliable theories that might baffle juries and a "stifling and repressive scientific orthodoxy" that might inhibit new truths or legitimate cases. *Id.* at 596. While preserving that balance, the *Daubert* analysis is not a substitute for cross-examination, contrary and compelling evidence, thoughtful jury instructions, and other methods inherent in federal trials to challenge shaky evidence. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

The court needn't conduct an evidentiary hearing here. No party has requested one in this case. The briefing, report, exhibits, and deposition testimony also permit the court to rule. *See, e.g.*, *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998).

DISCUSSION

In the context of recreational vehicles, weight distribution remains ever important. Manufacturers typically design recreational vehicles to specific load ratings, otherwise known as their gross vehicle weight rating (or GVWR)—the maximum permissible weight of a fully loaded vehicle. The vehicle's cargo carrying capacity will depend in part on its maximum permissible weight. With RVs that have two axles, such as this 2018 Phantom, the two axles will have their own gross axle weight rating (or GAWR). Total weight and weight distribution, among many other factors, will affect the safe operation of the recreational vehicle. Here, the Smiths remain ever concerned with the RV's weight, particularly the load on the front axle, as well as its overall carrying capacity for their use.

The "cantilever" opinion by Mr. Potis is unreliable and unhelpful. *See Liebhart v. SPX Corp.*, 917 F.3d 952, 963 (7th Cir. 2019). Cantilever is a scientific or technical term. It often refers to a "beam or member securely fixed at one end and hanging free on the other end." *McGraw-Hill Dictionary of Scientific and Technical Terms* at 244 (3d ed. 1984). A diving board is a good example. The cantilever effect at times gets loosely translated into the context where placing weight on one end of a beam has the effect of causing the beam, resting on a fulcrum in the middle or anywhere other than the ends, to shift on the other side, like two kids of unequal weight playing on a see-saw. Mr. Potis extrapolates cantilevering to the context of a two-axle vehicle and the distribution of weight within that vehicle.

First, for a two-axle vehicle, the cantilever effect (as he calls it) will depend not just on weight, but on the weight's placement within the vehicle, its proximity to the axles, the vehicle's overall wheelbase, and the fulcrum forces placed on each axle as a matter of that weight distribution, but Mr. Potis—unfamiliar with any method for calculating the change in weight distribution and its effect on GVWR or GAWR—ignores these critical variables. *See* ECF 53-10 at 7-9; *see*, *e.g.*, Giancarlo Genta & Lorenzo Morello, *The Automotive Chassis* 365 (2009); Sorcha O-Grady, "How to calculate axle weights," *TruckScience* (Dec. 6, 2018), https://truckscience.com/calculate-axle-weights/. In doing so, he lacks a

sound factual basis for his opinion. *See Daubert*, 509 U.S. at 590; *Wasson*, 542 F.3d at 1176; *see, e.g.*, *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 460 (7th Cir. 2019) ("To satisfy *Daubert*, [the opinion witness] needed to provide an explanation of how the evidence led to his conclusions.").

So important are these other variables to weight distribution that Nexus warns its customers about them. In its owner's manual, Nexus instructs an operator to "[l]oad the motor home and distribute the load so that you get proper weight on the axles" and that exceeding the GAWR or GVWR can cause undesirable handling characteristics and create a safety hazard. ECF 53-10 at 7. In addition to warning customers to weigh their vehicle, Nexus provides formulas for determining the effects of weight distribution, including for weight placed inside the wheelbase and outside the wheelbase. *Id.* at 8-9. For instance, for weight placed outside the wheelbase, the operator must determine the distance the object is from the nearest axle and divide by the RV's wheelbase. Thus, a 300-pound motorcycle hung 144 inches from the rear axle on an RV with a 178-inch wheelbase would actually act as though it weighed 540 pounds on the rear axle (180 percent of its actual weight), and only remove 240 pounds of weight off the front axle (80 percent). *Id.* at 9.

As a matter of physics and engineering, merely placing 50 pounds on the rear axle will not, in mere lockstep fashion, alleviate 50 pounds from the front axle's total load. But Mr. Potis seems to come at this issue from that crude perspective, proposing to opine that, "depending on the actual load, every pound placed in the rear portion of the vehicle will increase the available weight on the front axle." ECF 46-3 at 2. That fundamentally distorts the actual analysis. Indeed, for weight placed in the vehicle's rear but nonetheless within the wheelbase, some portion of that weight would be added to the front axle, not alleviated. ECF 53-10 at 8. Mr. Potis conducted no testing on this RV—though that could have been accomplished—to appreciate these principles or to explain what effect weight redistribution in this RV would have on the vehicle's GAWR and GVWR. Unfamiliar with any formula

for doing so, and unfamiliar with the proper method or factors that actually drive "cantilevering" in an RV, Mr. Potis lacks a sound factual basis for his opinion. *See Daubert*, 509 U.S. at 590.

To be sure, Mr. Potis concedes that RV loading and weight distribution share a formula, but he neither knows this formula nor attempted to apply it to this case. In the course of his work designing vehicles, he has physically redistributed weight to see what effect it may have on a vehicle, but he never performed that work on this RV (or one akin to it), though he acknowledges that his "cantilever" theory remains "specific to [the] particular situation." He says "[i]t depends on what the weights are to start with. The variables change constantly. No two vehicles weigh exactly the same, even if they're identical." He theorizes that, depending on how much weight exists in the vehicle, weight placed in the rear could have a percentage improvement to the front, but he has no idea how much improvement, or the associated weight or its placement, much less whether it would impact the RV during operation. "[O]pinion has a significance proportioned to the sources that sustain it." *Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat. City Bank*, 170 N.E. 479, 483 (N.Y. 1930) (Cardozo, J.). His opinion here lacks any such source.

Second, his method isn't really a method at all; it is his say-so divorced from any factual basis or any validation that mirrors the method one, experienced as he may be in the field, would employ and has employed to measure the so-called cantilever effect in other recreational vehicles (just not this one). *See Kumho Tire*, 526 U.S. at 157. An opinion witness must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field." *Id.* at 152; *Jenkins*, 487 F.3d at 489. Mr. Potis says, in other vehicle designs, he has fiddled with the weight to see what effects it might have on the vehicle, and readily confesses that to determine its effect here he would need to physically perform that weight redistribution in this RV. But he didn't. Focusing on his methodology rather than his conclusion, as the court should, *see Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007), he thus abandoned the method he has used in the past during his normal work.

8

"Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000); *see also Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (a leap from an accepted premise to an ultimate conclusion without data or analysis has been "repeatedly characterized as insufficient"); *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.") (internal quotations omitted).

Third, Mr. Potis hasn't properly validated his opinion. There is no reason to have published the theory here; indeed, the importance of weight distribution within a recreational vehicle is well-known in the industry. That said, he performed no testing, though he could, that would substantiate his opinion or assist the jury. That leaves the error rate to his theory unreliably high and fundamentally speculative. *See, e.g., Winters*, 498 F.3d at 743 ("The proposed experts both failed to test their alternative designs and also failed to utilize any other method of research to compensate for their lack of alternative testing.").

Fourth, his so-called cantilever theory provides no help to the jury here. After the summary judgment ruling, his theory does not reliably guide the jury to answer the question it must: whether the RV was fit for its ordinary purposes. *See* Ind. Code § 26-1-2-314(2). Instead, Mr. Potis would confuse the jury and invite the jury to guess whether and to what extent weight redistribution, under his so-called cantilever theory, might alleviate the load on the front axle to secure its overall safety and ordinary utility as a recreational vehicle. *See* Fed. R. Evid. 403; *see, e.g., Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (excluding testimony where the expert relied on an assumption not based on evidence and the testimony did not fit the facts of the case). For instance, in his deposition, he concedes that placing weight in the back area "can" reduce the weight on the front axle depending on how much load exists and a number of other variables that he cannot articulate.

To put a finer point on this, Mr. Potis is no different than a Rule 702 witness who might wish to opine on the effect of gravity; and, though we all appreciate that gravity exists as a scientific principle and have even seen it in our experience, he could not say that it causes an object to fall at the rate of 9.8 meters/second$^2$ (without regard to mass) or use that to calculate the impact force of a falling object on an individual who thereby suffers an injury. One might likewise appreciate that friction exists as a scientific principle; but, unlike Leonardo da Vinci or anyone since, he cannot put into words how that is measured in terms of its static or dynamic coefficient to explain its effect on rubber soles of work boots. In short, it's one thing to appreciate that a principle exists; it's quite another to do one's homework and apply the principle reliably to a case to enable an opinion in federal court and to guide a jury to answer the question in dispute. Mr. Potis doesn't do so here. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."); *Huey v. UPS*, 165 F.3d 1084, 1087 (7th Cir. 1999) ("Expertise is a necessary but not a sufficient condition of admissibility under Rule 702. [The opinion witness] may have specialized knowledge or skills, but he did not apply them to the analysis of [this] claim.").

Fifth, though Mr. Potis has experience within the RV industry, his experience doesn't enable him to opine about this specific subject of so-called cantilevering. Qualifications must provide a foundation for an expert to answer the specific question. *See Gayton*, 593 F.3d at 617-18. Mr. Potis has years of experience in the RV industry. He has worked in the RV industry since 1997, as a manager of product development, director of engineering and product development, and director of manufacturing. He says he is qualified not based on education or formal training but "[b]ecause of [his] years [] working with RVs . . . designing, building, and modifying" them. His former job at Nexus involved designing new floor plans and standard everyday engineering work. He was tasked with ensuring that the RVs were compliant with guidelines and specifications. He would investigate and

solve issues in the RVs. He has no engineering degree or formal education or training in the RV industry, and no mechanical certifications from any accredited RV or engineering organization, but formal education isn't always needed. *See Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

Mr. Potis has experience to be sure; but, even if eminently qualified, experts cannot offer opinions based merely on their say-so. *See Kumho Tire*, 526 U.S. at 157; *Joiner*, 522 U.S. at 146; *see, e.g.*, *Zenith*, 395 F.3d at 419 (witness "may be the world's leading student of MMDS services, but if he could or would not explain how his conclusions met the Rule's requirements, he was not entitled to give expert testimony"). The jury would be left assuming a general principle—the cantilever theory— but only because Mr. Potis says it operates here, without data or other validation that would permit the jury to utilize it to reach a verdict. That is exactly the proposed testimony that the *Daubert* trilogy and Rule 702 properly exclude. *See Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, 661 F.3d 959, 965 (7th Cir. 2011).

To the extent Nexus argues that this so-called cantilever theory requires no expert testimony, that certainly is a shift from its own Rule 702 disclosure, inconsistent with the nature of the proposed testimony, and inconsistent with Nexus' belief that the information is at least specialized enough that it must warn about its effects to its customers. *Daubert* applies equally to specialized knowledge as it does scientific testimony.[1] Fed. R. Evid. 702. A lay juror may well generally appreciate how a see-saw or diving board works, though not intuitively the workings of the underlying scientific principles, and not the so-called cantilever theory in the context of a two-axle vehicle. To that very point, even Mr. Potis appreciates the theory only generally, not reliably as applied here. In addition, whether he is a

---

[1] Oddly, Nexus calls cantilevering both "scientific" and yet "a basic concept to the point where it may not even be considered an expert field at all." ECF 48 at 12. Rule 702 applies to all testimony based on "scientific, technical, or other specialized knowledge."

11

Rule 702 witness or lay witness, neither status would render his opinion admissible when it consists merely of unsupported inference. *See Zenith*, 395 F.3d at 419-20.

Having excluded this proposed testimony on the so-called cantilever theory under *Daubert*, the court turns to the remainder of his opinions. The Smiths seek to exclude no other opinion. Mr. Potis' opinion that the vehicle's cargo carrying capacity is more than sufficient and exceeds industry standards is not contingent on the cantilever theory. His opinions based on certified CAT scale weight likewise remain independent. The Smiths attack Mr. Potis in whole based on his cantilever theory, but his opinions are not so prone to such a narrow view or basis.

Accordingly, Mr. Potis may testify to the remainder of his opinions under *Daubert*, with the only limitation to these opinions at this point coming from Nexus' violation of the court's order concerning his inspection. The Smiths argue that Mr. Potis' entire testimony should be excluded because of his failure to abide by the court's order requiring him to videotape his inspection. "An award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery." *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993). The court need not choose the "least drastic" or "most reasonable" sanction. *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996). When deciding a sanction, the court may review the offending party's conduct in light of the entire history of the case, including all other procedural errors it has committed. *E360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011).

Though Nexus passes off its disregard for the court's discovery order as inadvertence, this has not been its only procedural error, given the untimeliness of its response to the motion to exclude, which the court nonetheless has considered in full. Given the motion to compel and the magistrate judge's order requiring Mr. Potis to videotape his entire inspection, there wasn't any mystery as to the court's expectation, nor that of the Smiths. Merely recording 5 minutes of a 105-minute inspection cannot be considered anything close to substantial compliance, much less compliance in truth.

That said, the court will permit Mr. Potis' testimony to the extent that his videotapes reflect his inspection and scope of his opinions—in short, his permitted testimony will remain proportional to his compliance. Aware that the CAT scale weighing occurred without videotape, the opinions based on this measurement will be allowed to the extent that Mr. Potis has preserved and produced the records from it—namely the weight ticket.

## CONCLUSION

Accordingly, the court GRANTS and DENIES IN PART the Smiths' motion to exclude Nexus' opinion witness (ECF 45). Given the court's limitations on Mr. Potis' proposed testimony, the court DENIES the Smiths' motion to strike (ECF 50).

SO ORDERED.

July 13, 2020                               *s/ Damon R. Leichty*
                                            Judge, United States District Court